Filed 6/28/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE RODRIGUEZ OLIVAS,<br><br>    Defendant and Appellant. | H040864<br>(Santa Cruz County<br>Super. Ct. Nos. F07574, F24276) |

A jury convicted defendant Jose Rodriguez Olivas of 17 felony counts related to his continuous sexual abuse of M.M. (minor) between 1995 and 2003. (Pen. Code, §§ 288.5, subd. (a); 288, subd. (b)(1); 269, subd. (a)(1), (a)(4).)[1] The trial court imposed a 78-year determinate prison sentence for the continuous sexual assault and the forcible lewd act counts. It also imposed a consecutive indeterminate term of 75 years to life for the aggravated sexual assault counts.

On appeal, defendant argues his trial counsel provided ineffective assistance by failing to request a jury instruction about voluntary intoxication. He also contends he was prejudiced by the trial court's incorrect response to a jury question. We will conclude defendant's trial counsel did not provide ineffective assistance. However, the trial court prejudicially erred in its response to the jury's question about the aggravated sexual assault counts. Accordingly, we will reverse the judgment on the aggravated sexual assault counts and will remand this matter for further proceedings.

---

[1] Unspecified statutory references are to the Penal Code.

# I.    TRIAL COURT PROCEEDINGS

Minor was born in September 1990 to Yolanda (mother) and a man other than defendant. Minor has two older sisters, Y. (born in December 1983) and B. (born in May 1988).[2] Minor also has two younger half sisters and a younger half brother. Defendant is the father of minor's half sisters. Mother is the mother of all six children.

## A. THE PINES APARTMENT BEFORE MOVING TO MÉXICO

According to minor's testimony at defendant's jury trial, minor was five years old when she lived with mother and defendant (who was mother's boyfriend) in a two-bedroom apartment at an apartment complex in Watsonville. The apartment complex was called The Pines. Minor testified that defendant was nice at first but at some point told her he wanted to have "father and daughter love" with her. Defendant would wink and make other gestures toward minor when mother was not looking. Defendant began kissing minor on the lips using his tongue, and touching her "private parts," including her chest, vagina, and back. Minor testified that defendant touched her vagina and put his hand between her labia "many times," "like, an everyday thing ... ." These touching incidents occurred in the kitchen, minor's bedroom, and in defendant's car. Minor testified that defendant picked her up from school very often during this period. Defendant reportedly told minor, "[T]hat's how a father, like, shows his love to a daughter." He also told her not to tell anyone. Minor eventually moved with her mother to México for a short time when she was about five-and-one-half years old.

## B. LOS ANGELES HOTEL AND THE PINES WITH B. AND Y.

Minor testified that she and B. came back to California after about a month in México. Defendant picked them up and took them to a hotel in Los Angeles for the night. Defendant asked minor to sleep in his bed with him rather than with B. in her bed, but B. refused to let minor do so. Although minor had fallen asleep in B.'s bed, she woke

---

[2]  We have abbreviated the names of B. and Y. in the interest of protective nondisclosure.

up in defendant's bed without remembering how she got there. At some point while staying at the hotel, the girls went to the bathroom to take a shower. Defendant tried to enter the bathroom, but the door was locked. Defendant then banged on the door and told the girls to open it, but they refused.

According to minor's testimony, mother and Y. returned to California shortly after minor and B.'s return. They all moved into the two-bedroom apartment at The Pines. Minor, B., and Y. shared one room while mother and defendant shared the other. Because minor shared a room with her sisters, defendant no longer had access to her at night, but minor testified that defendant would touch her inappropriately during the day. Defendant would rub her chest and would put his hand between her labia, moving his hand up and down.

Minor also testified that defendant's conduct after she returned from México escalated. Defendant would expose himself to her and would make her touch his penis when her sisters were not home or when they were in a different room. Defendant would also grab minor's hands, put them on his penis, and make her massage it back and forth. Defendant "would get mad" if she refused and would tell her that he was the one who bought food and paid for rent and electricity, which minor understood as threats that he would withhold those things if she refused his sexual demands. He would tell minor: "I am the one who rules here."

## C. WATSONVILLE HOUSE

Around 1999 or 2000, the family moved to a house in Watsonville. Minor, Y., and B. shared a room at the house. Defendant frequently grounded minor and B., and would punish them by making them copy pages from books or write apology letters to him. Minor testified that defendant would also ground her if she cried during inappropriate touching incidents or if she prepared his beer incorrectly.

Defendant drank almost every day. Once or twice a week he would come home at 3:00 or 4:00 in the morning. He would call mother and her daughters beggars, and he

3

would hit walls and throw things. Minor testified that defendant would smell like alcohol when he returned home late at night. Minor, B., and mother would stay in the girls' bedroom when defendant came home late. Defendant would then kick the door open and make mother come to bed with him. The door jamb was sometimes damaged by defendant's kicking.

By the time they were living at the Watsonville house, defendant reportedly told minor: " 'Now you're older you can do more things.' " Minor testified that defendant followed a routine in which he would touch her inappropriately. He would begin by touching her chest, he would then put his fingers between her labia, and then he "would do the same in the back." Defendant would then have her touch his penis while he kissed her on the mouth, and he would make her put her mouth on his "private part." Minor testified that when oral sex occurred, defendant would put her on her knees and tell her to lick, kiss, and suck his penis while he grabbed her head from the back. When there was not enough time, defendant would touch minor's chest, "private part," and back. The touching incidents occurred in the kitchen, defendant's bedroom, the living room, and once in the back yard.

Minor also testified that defendant started rubbing his penis between her labia at some point while they lived at the Watsonville house. Sometimes defendant would rub his penis hard enough against her labia that it would hurt. When asked at trial how often this happened, minor said: "All the time. It was just every day." She testified that the genital-to-genital contact occurred in defendant's bedroom, the kitchen, and the back yard.

Minor testified that defendant frequently smelled like alcohol during touching incidents, but there were also "times when he didn't have alcohol on his breath." If minor cried, defendant would grab her arm and tell her to stop crying, which sometimes left bruises on her arm. Defendant continued to threaten to withhold food and to stop paying bills if minor did not comply with his sexual demands. On certain occasions

4

when minor resisted, defendant carried through on his threats by not buying food and by disconnecting the electricity. Defendant would tell minor: " 'I didn't bring food because you're being bad.' " Minor testified that she understood being bad to mean "[n]ot letting him touch me."

Minor recalled an incident involving a K-Mart. She thought the incident had occurred when she was seven or eight years old, but she also testified she thought they were already living at the Watsonville house then (by which time minor was at least eight years old). Defendant picked minor up from school, took her to a K-Mart in Watsonville, and told her to choose all the toys she wanted. Minor picked out several toys and put them in a cart. Defendant told her they would come back for the toys later. Defendant then took minor to the car and told her that if she wanted the toys she would have to take her clothes off and get on top of him. Minor started crying. Defendant got mad at her for crying, took her home without any inappropriate touching, and grounded her for two or three months.

Minor also recalled an incident involving a hotel that occurred when she was nine or 10 years old. Defendant took minor to a hotel room and told her she would have to do "certain things" for him or he would not sign a permission slip for her to participate in a school field trip. Minor testified she was crying, but defendant told her to be quiet and to take off her clothes. Minor took off her clothes and defendant laid her on the bed. Minor initially testified that defendant's inappropriate conduct consisted only of touching her chest and vagina with his hand and fingers. But after the prosecutor refreshed minor's recollection with statements minor made to an investigator before trial, minor testified that defendant also made minor put her mouth on defendant's penis during this incident.

### D. DOMESTIC VIOLENCE ARREST

In January 2002, minor heard mother and defendant arguing in their bedroom. Minor testified that she and B. went to the locked bedroom door and tried to open it because minor could hear loud screams. One of them managed to get the door open and

minor saw mother in a corner of the bedroom with defendant on top of her. Minor tried to call 911 but defendant disconnected the phone by pulling out the cord. Minor then ran to a neighbor's house and called the police. Police officers responded and arrested defendant.

Defendant returned to the house within days of the arrest when mother reportedly "removed the charges" against him. Minor testified that defendant was very aggressive toward her when he returned because he blamed her for calling the police. Once defendant was back in the house, minor and B. started to disobey him. Defendant moved out of the house shortly thereafter. Minor believed he left because "he didn't like that his authority was being challenged" by the girls.

### E. MINOR'S DISCLOSURE TO FAMILY

In May 2003, defendant returned to the house a second time. Minor testified that she returned from school one day and found defendant in mother's bedroom. Minor decided she "couldn't take it anymore" and told Y., B., and possibly mother that defendant had been "touching me and making me put my mouth on his private part." Minor cried uncontrollably. B. and Y. screamed at defendant, and defendant packed his things very quickly and left the house. Minor did not see defendant again until the trial in this case.

The day after minor disclosed the abuse allegations, mother took her to a Planned Parenthood clinic where Physician's Assistant Susan Lasko performed an examination. According to Lasko's notes from the visit, minor told her she could not remember if penetration occurred. Minor explained at trial that she denied having been penetrated by defendant because at the time of the examination she thought Lasko was asking whether defendant's penis had ever gone "all the way in" her vagina.

In 2014, Lasko testified at trial based on a report she prepared in 2003 after conducting an external genital examination of minor. Lasko found no bruising, bleeding, or trauma on minor's external genitalia. Lasko testified that minor had told her that

6

defendant had not molested her in months or possibly years. Lasko opined that it "would have to be very extensive trauma to leave anything that could be seen after months." Lasko also testified that her notes stated that defendant, " '[p]ossibly rubbed [his] penis on [minor's] external genitals,' " but Lasko could not recall further details about minor's disclosure in this regard.

### F. INITIAL INTERVIEW WITH SOCIAL WORKER AND THE POLICE INVESTIGATION

A few days after minor's visit to Planned Parenthood, social worker Robert Sabala briefly interviewed minor at her middle school. Minor testified at trial that she withheld some information about defendant's conduct during the interview with Sabala because she did not know whether defendant would return again like he had after the domestic violence incident. She also said she did not trust Sabala because she had trouble trusting men at that point in her life.

Sabala testified at trial that the purpose of the interview was to collect basic information that he could forward to law enforcement. According to Sabala, minor told him that inappropriate touching by defendant (including on her vagina and " 'butt' ") occurred from age five through 12. Minor reportedly told Sabala that defendant "had 'made sex' " with her. Based on those disclosures, Sabala contacted the police and ended his interview when Watsonville Police Officer Bobby Griffith arrived at the school.

Minor recalled at trial that a police officer had interviewed her at school. She told the officer that defendant had touched her private parts when she was six or seven years old. She then requested to speak with a female police officer. Officer Griffith testified at trial and corroborated minor's account of the interview, recalling that minor was "very hesitant" to speak with him and that she requested to speak with a female police officer instead. Officer Griffith recalled that minor had disclosed that defendant had touched her private areas when she was between six and seven years old.

In June 2003, Watsonville Police Officer Monica Herrera interviewed minor. Minor testified at trial that she told Officer Herrera that defendant touched her vagina and

rubbed his penis on her vagina, but she did not tell the officer about any oral copulation incidents because she was embarrassed and felt like she could not trust anyone.  Minor also told Officer Herrera that defendant's abuse stopped when minor was eight or nine years old.

Officer Herrera testified at trial, stating that minor told her that defendant rubbed her breasts and vagina with his hand during touching incidents.  An audio recording of minor's interview with Officer Herrera was admitted into evidence and played at trial.

### G. THERAPY, DEFENDANT'S ARREST, AND DISTRICT ATTORNEY INVESTIGATION

Minor testified that she met with a psychotherapist named Margarita Swan after attempting to commit suicide when she was 14 or 15 years old.  Swan confirmed during her trial testimony that minor came to her for therapy for a few months in 2006 and for a few months in 2013.

Defendant was arrested in July 2012.  Following defendant's arrest, minor had two interviews with Katrina Rogers, an investigator for the District Attorney's Office.  Minor testified that she told Rogers about the hotel incident where defendant made her put her mouth on his penis.  Rogers, in turn, testified that minor told her it was " 'never a rape,' " and that during the first interview minor did not mention any abuse occurring when minor was 10 or 11 years old.

Rogers testified that she scheduled a second interview with minor to clarify gaps in her understanding of the abuse allegations.  Rogers asked minor to prepare a timeline of events to help the investigation.  At the second interview, minor told Rogers that after each sexual touching defendant would give her a dollar.  At trial, minor acknowledged on cross-examination that she had never disclosed that detail to anyone before the second interview with Rogers.

8

## H. TRIAL

### 1. The Felony Complaints

Defendant was charged by two felony complaints and held to answer on each (the complaints were later consolidated). In January 2014, defendant was charged by first amended felony information with: continuous sexual abuse of minor (§ 288.5, subd. (a); count 1); forcible lewd acts upon minor when she was six years old (§ 288, subd. (b)(1); counts 2 and 3); forcible lewd acts upon minor when she was seven years old (§ 288, subd. (b)(1); counts 4 and 5); forcible lewd acts upon minor when she was eight years old (§ 288, subd. (b)(1); counts 6 and 7); forcible lewd acts upon minor when she was nine years old (§ 288, subd. (b)(1); counts 8 and 9); aggravated sexual assault of minor by oral copulation when minor was between seven and 10 years old (§ 269, subd. (a)(4); counts 10, 12, 13, and 14[3]); aggravated sexual assault of minor by rape when minor was between seven and 10 years old (§ 269, subd. (a)(1); count 11); forcible lewd acts upon minor when she was between seven and 10 years old (§ 288, subd. (b)(1); counts 15 through 19[4]); forcible lewd act upon minor by touching her chest and vagina in a hotel room when she was between seven and 10 years old (§ 288, subd. (b)(1); count 20[5]); forcible lewd acts upon minor when she was 10 and 11 years old (§ 288, subd. (b)(1); counts 21 and 22); and lewd act upon B. when she was nine, 10, or 11 years old (§ 288, subd. (a); count 23).

Counts 15 through 19 were charged in the alternative to counts 10 through 14, respectively. The first amended information also contains a multiple victim special allegation (§ 667.61, subds. (a), (b), (e)).

---

[3] Count 14 alleged that the conduct occurred in a hotel room.

[4] The amended information alleges: "Counts 2-9 and 22-23 allege acts that are separate and distinct from those acts alleged in counts 10-20."

[5] The amended information alleges: "The facts involved in [count 20] occurred in the 'hotel incident' alleged in Count 14 - however this lewd act involved the defendant touching [minor's] chest and vagina in the hotel room."

## 2. Trial Testimony

At trial, the prosecution elicited the testimony of several witnesses upon which the foregoing summary is based. The prosecution also asked minor questions seeking to quantify the number of times various types of touching occurred. Defendant did not testify.

*Minor's Testimony* – Minor testified that defendant touched her inappropriately two to three times per day when she was six years old, and "many times" when she was seven and eight years old. Minor also testified that when she was between the ages of five through 12, defendant "[d]efinitely" touched her vagina more than twice a year. She testified that from ages five to 12, defendant rubbed his penis on her vagina more than once per year. Minor explained that she complied with defendant's sexual demands because he sometimes grabbed her and also because of his statements about being the one who bought food and supported the family.

*B.'s Testimony* – Minor's older sister B. corroborated minor's account of the night they stayed with defendant at a hotel in Los Angeles. B. said she woke up to see minor in defendant's bed. She also said defendant tried to enter the bathroom when the girls were showering. B. also testified that defendant drank alcohol frequently, sometimes kicked open the door to her bedroom, and argued with her mother. B. said she saw defendant kiss minor on the lips "many times" at both The Pines apartment and at the Watsonville house. She recounted certain kissing incidents in detail, including two that occurred at The Pines apartment, two inside the Watsonville house, and another in the Watsonville house's back yard.

B. testified that during a kissing incident near the kitchen at the Watsonville house, she saw defendant grab minor and kiss her on the mouth with his tongue out. She stated that defendant grounded her when she confronted him about kissing minor. B. also stated that, on one occasion at The Pines apartment, defendant pressed B. against the wall

10

and tried to kiss her on part of her mouth. B. moved her head out of the way and slapped him.

During the domestic violence incident, B. testified she saw defendant push mother to the ground. On cross-examination, B. acknowledged inconsistencies between her trial testimony and the statements she made to Officer Griffith when he interviewed her in 2003, including that she told Officer Griffith that defendant never tried to touch her.

*Mother's Testimony* – Mother corroborated minor's testimony that defendant drank alcohol frequently. Mother also testified that defendant grounded minor and B. regularly, broke doors, and sometimes refused to buy food for the family. Mother stated that during the domestic violence incident, defendant threw her against the wall. She said police came when one of her daughters called them from a neighbor's house. Mother testified that after minor disclosed the abuse allegations, defendant told her: " 'I am not denying it. When I was drunk, perhaps I disrespected her. But I did not have sexual relations with her.' " Mother stated that "disrespecting" minor meant touching her private parts. Defendant also reportedly told mother to take minor to the doctor " 'and you will find out that ... I did not do anything with her ... .' " Mother acknowledged on cross-examination that she initially thought minor was lying about defendant to keep her from getting back together with him.

*Y.'s Testimony* – Minor's oldest sister Y. testified and corroborated minor's testimony that defendant frequently came home late and was "really aggressive," that he frequently grounded B. and minor, and that the domestic violence incident essentially occurred as described by minor. Y. also testified that on the day minor disclosed the abuse by defendant, minor told her that defendant touched her privates and made her kiss his privates. Y. said she never personally witnessed defendant touch minor inappropriately.

*Dr. Francis Abueg's Testimony* – Dr. Francis Abueg, a clinical psychologist, was called out of order as a defense expert about the ways memory can be affected by trauma

11

and by psychiatric treatment. He stated that a person's memory can be distorted by some therapy and interview methods, including hypnosis and the use of leading questions. He testified that the risk that memory might be distorted is increased when the person being interviewed is a child or adolescent because younger people can be more susceptible to suggestion. He also testified that he reviewed the transcript of minor's interviews with Officer Herrera and investigator Katrina Rogers and opined there was evidence of possible memory distortion. Dr. Abueg noted that minor had been asked leading questions during these interviews. He also stated that the discrepancies between minor's disclosures in 2003 to Officer Herrera and the more severe allegations disclosed to Rogers in 2012 "are a concern."

*Dr. Gail Goodman's Testimony* – Dr. Gail Goodman, a professor of developmental psychology, testified for the prosecution as an expert in psychology and child memory. Dr. Goodman explained that children sometimes delay disclosure of abuse or they will disclose details gradually over multiple interviews due to embarrassment. Dr. Goodman stated that Dr. Abueg's opinions were based on overgeneralizations of the research material he had relied upon. Dr. Goodman opined that minor demonstrated some level of resistance to false suggestion, noting that minor corrected Officer Herrera during the 2003 interview about the specifics of her allegations.

### 3. Closing Argument and Jury Instructions

Defense counsel argued during his closing argument that the prosecution had not met its burden to show defendant was guilty of any of the crimes charged. Counsel also argued, in the alternative, that if the jury believed minor's statements about inappropriate touching, there was an inadequate showing of force or duress such that defendant could only be guilty of lewd or lascivious conduct without force (§ 288, subd. (a)).

Among the instructions provided to the jury, the trial court provided CALCRIM No. 3518 that states, in relevant part: "It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a

12

lesser crime only if you have found the defendant not guilty of the corresponding greater crime."[6] Defense counsel did not request that the court provide an instruction regarding voluntary intoxication.

During deliberations, the jury submitted the following question to the court: "If we are 'hung' on a count (ie: 14), are we able to consider the alternate count (ie: 19?)" (Capitalization omitted.) At a hearing outside the presence of the jury, the court stated: "[T]he next statement is if we are hung on a count, are we able to consider the alternate count? The answer would be no." Defense counsel responded: " 'No' would be fine." The court then provided the following response to the jury: "No." The jury also requested a read-back of minor's testimony "pertaining to the 'hotel incident,' " which the trial court provided.

The day after the court received the jury's question about considering alternate counts, the jury found defendant guilty of counts 1 through 14 and 20 through 22. The jury found defendant not guilty of count 23 (defendant's alleged lewd act upon B.). Having returned guilty verdicts on counts 10 through 14, the jury did not return verdicts on the alternate counts (counts 15 through 19). The court sentenced defendant to 153 years in state prison, consisting of a determinate 78-year term for counts 1 through 9 and 20 through 22 as well as an indeterminate term of 75 years to life for counts 10 through 14.

## II.   DISCUSSION

### A.  VOLUNTARY INTOXICATION INSTRUCTION

Defendant argues that his trial counsel provided ineffective assistance by failing to request a jury instruction regarding voluntary intoxication, such as CALCRIM No. 3426. CALCRIM No. 3426 provides, in relevant part: "You may consider evidence, if any, of

---

[6] The parties waived the right to have the reading of the jury instructions reported. We rely on the version of the jury instructions contained in the Clerk's Transcript.

the defendant's voluntary intoxication ... only in deciding whether the defendant acted" with the specific mental state required to be convicted of a specific intent crime.

To establish ineffective assistance of counsel in violation of defendant's right under the Sixth Amendment to the United States Constitution, defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) Deficient performance is rarely shown if there was a tactical reason for trial counsel's conduct. (See *People v. Cruz* (1980) 26 Cal.3d 233, 255–256 ["except in rare cases, an appellate court should not attempt to second-guess trial counsel as to tactics"]; *People v. Bolin* (1998) 18 Cal.4th 297, 317 [no reversal when alleged failure to object "may well have been 'an informed tactical choice within the range of reasonable competence' "].) To prove prejudice, defendant bears the burden to show a reasonable probability that, but for his trial counsel's errors, the result would have been different. (*Ledesma*, at pp. 217–218.) A reasonable probability is one " 'sufficient to undermine confidence in the outcome.' " (*Id.* at p. 218, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 693–694.)

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent ... ." (§ 29.4, subd. (b).) Section 288 describes a specific intent crime (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1289), requiring commission of the offense "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child ... ." (§ 288, subd. (a).) A trial court has no sua sponte duty to instruct on the significance of voluntary intoxication. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295 (*Verdugo*).) To receive a voluntary intoxication instruction, defendant must demonstrate that there is " 'substantial evidence of the defendant's voluntary intoxication and [that] the intoxication affected the defendant's "actual formation of specific intent." ' " (*Ibid.*)

The primary defense theory at trial was that defendant had not committed the crimes of which he was accused. During closing argument, defense counsel argued: "I'll

tell you what I think happened here. I think, when [minor] was young, she told a lie to get [defendant] out of the house because she really didn't like him. And she got very engrained in that lie, and she told the authorities as well as doctors." Based on that theory, defense counsel urged a not guilty verdict: "[M]y belief is that the only possible verdict that you could come to here is not guilty on everything." Defendant also argued that "if there are some of you [who] believe what she said, what she described was 288(a), she did not describe things that meet the requirements of the law for these other much more serious crimes."

Though defendant argues on appeal that his trial counsel was ineffective for failing to request a voluntary intoxication instruction, such a request would have been inconsistent with the primary defense theory that no misconduct occurred. Requesting an instruction on voluntary intoxication would have implied that defendant committed the sexual misconduct but that he was not criminally liable for his conduct because his intoxication negated the specific intent necessary to convict him under section 288. As that argument is wholly inconsistent with the primary defense theory that minor "told a lie" and defendant did not actually engage in sexual misconduct, trial counsel had a tactical reason for not requesting a voluntary intoxication instruction.

Defendant contends that giving a voluntary intoxication instruction would not have undermined his defense theory because his trial counsel also argued that there was insufficient evidence of force to convict defendant of anything more than non-forcible lewd or lascivious conduct (§ 288, subd. (a)). But trial counsel's argument regarding the evidence of force did not undermine the primary defense theory in the same manner as a voluntary intoxication instruction would have. That argument merely asserted that the trial witnesses' descriptions of defendant's conduct did not meet the required elements of the charged crimes because there was inadequate evidence of force as a matter of law; it did not include an implied admission that defendant had in fact engaged in the sexual misconduct.

15

Defendant also argues that defense counsel should have requested a voluntary intoxication instruction because there was evidence that defendant drank regularly and was drunk when he touched minor inappropriately. Defendant notes that minor testified that she sometimes (but not always) smelled alcohol on defendant's breath during touching incidents. Defendant also notes that mother testified that on the day minor disclosed the abuse to her family, defendant told her: " 'When I was drunk, perhaps I disrespected her.' "

Even assuming the foregoing provides substantial evidence that defendant was voluntarily intoxicated during at least some of the inappropriate touching incidents, defendant offered no evidence at trial to demonstrate how that intoxication might have resulted in his inability to formulate the specific intent necessary to violate section 288. (*Verdugo*, *supra*, 50 Cal.4th at p. 295.) Given the absence of such evidence, defense counsel could reasonably have made the tactical decision not to request a voluntary intoxication instruction.

Because multiple tactical reasons support defense counsel's decision not to request a voluntary intoxication instruction, defendant has not met his burden to show deficient performance by his counsel. His claim of ineffective assistance of counsel therefore fails.

### B. THE ORDER OF DELIBERATIONS

Defendant argues the trial court prejudicially erred by incorrectly responding "No" to the following question the jury asked during deliberations: "If we are 'hung' on a count (ie: 14), are we able to consider the alternate count (ie: 19?)" (Capitalization omitted.) Notwithstanding defendant's failure to object below, we will consider this claim. (*People v. Ngo* (2014) 225 Cal.App.4th 126, 149 [" 'Whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim' ... ."]; § 1259 ["The appellate court may also review any instruction given, refused or modified, even though no objection was made

16

thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

"No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)  Our high court has not provided definitive guidance on the standard of review applicable when deciding whether a trial court has misdirected a jury, but it appears we are to review instructional error arguments de novo.  And if the challenged instruction is ambiguous, we are to independently review whether there is a "reasonable likelihood that the jury construed or applied the challenged instructions in a manner" contrary to law.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1077 (*Berryman*), overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*); see *People v. Kurtzman* (1988) 46 Cal.3d 322, 335 (*Kurtzman*) ["It is clear ... the trial court erred in instructing the jury not to 'deliberate on' or 'consider' " a lesser included offense, suggesting de novo review].)  Our high court has expressly applied a de novo standard of review to the similar issue of whether a trial court failed to instruct on an uncharged lesser included offense.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733 ["An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense."].)  But even if a trial court misdirects a jury, the miscarriage of justice test "is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*) [finding failure to instruct sua sponte on a lesser included offense subject to *Watson* error analysis], quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

### 1. The Trial Court Committed *Kurtzman* Error

In *Stone v. Superior Court* (1982) 31 Cal.3d 503 (*Stone*), our Supreme Court held that trial courts are "constitutionally obligated to afford the jury an opportunity to render a partial verdict of acquittal on a greater offense when the jury is deadlocked only on an uncharged lesser included offense." (*Id.* at p. 519.) Six years later, in *Kurtzman*, the court determined that "*Stone* should be read to authorize an instruction that the jury may not *return a verdict* on the [uncharged] lesser offense unless it has agreed beyond a reasonable doubt that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense." (*Kurtzman*, *supra*, 46 Cal.3d at p. 329, original italics.) *Kurtzman* thus affirmed the validity of an "acquittal-first" rule—that the jury may not return a verdict on a lesser offense unless it first finds a defendant not guilty of the greater offense—but rejected a strict acquittal-first rule, applied in some states, "under which the jury must acquit of the greater offense before even considering lesser included offenses." (*Id.* at pp. 329, 333-334.)

*Kurtzman* involved an appeal from a second-degree murder conviction. (*Kurtzman, supra,* 46 Cal.3d at pp. 327–328.) During deliberations, the jury asked the trial court: " 'Can we find the defendant guilty of manslaughter without unanimously finding him not guilty of murder in the second degree?' " (*Id.* at p. 328.) The trial court responded: " 'No, you must unanimously agree on the second degree murder offense before *considering* voluntary manslaughter.' " (*Ibid.*, italics in *Kurtzman* opinion.) Applying the acquittal-first rule, the *Kurtzman* court said: "It is clear under the acquittal-first rule suggested in *Stone* and clarified here that the trial court erred in instructing the jury not to 'deliberate on' or 'consider' voluntary manslaughter unless and until it had unanimously agreed on second degree murder." (*Kurtzman*, at p. 335.) The *Kurtzman* court nonetheless affirmed the conviction in that case, finding no reasonable probability of a more favorable result because the record showed that "the jurors had in fact

18

deliberated on both degrees of murder and on voluntary manslaughter for two days prior to the first erroneous instruction and because even thereafter, despite erroneous guidance from the court, they obviously continued to consider both voluntary manslaughter and second degree murder ... .” (*Ibid.*)

Defendant argues that the acquittal-first rule is inapplicable here because his case involved alternate counts, not uncharged lesser included offenses. He cites to *People v. Blair* (1987) 191 Cal.App.3d 832, 836, 839, where an appellate court held that “jurors were not required to unanimously find the defendant not guilty of burglary before they could consider whether he was guilty of [the alternate count of] receiving [stolen property].” But more recently, in *People v. Bacon* (2010) 50 Cal.4th 1082 (*Bacon*), our Supreme Court suggested that the acquittal-first rule applies to alternate counts. (See *Bacon*, at p. 1110 [rejecting the argument that the jury did not know it could choose the order of deliberations because “it was not reasonably likely the jury would have failed to understand that it had the ‘discretion to choose the order of evaluation’ for the alternative charge of accessory after the fact to murder”].) Based on *Bacon*, we will assume for purposes of this opinion that the acquittal-first rule applies to counts charged in the alternative.

The trial court’s answer here of “No” to the jury’s question whether they were “able to consider” a forcible lewd act count if the jurors were hung on the more severe aggravated sexual assault count had the same effect on the jury as the answer the *Kurtzman* court found had violated California’s acquittal-first rule. (*Kurtzman*, *supra*, 46 Cal.3d at p. 335.) Even if not error per se, there is a reasonable likelihood the jury here construed or applied the trial court’s response in a manner contrary to *Kurtzman*. (See *Berryman*, *supra*, 6 Cal.4th at p. 1077, overruled on another ground by *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)

The Attorney General argues that the trial court properly instructed the jurors with CALCRIM No. 3518 regarding the order of deliberations before deliberations began.

19

She also argues that the trial court's response to the jurors' question during deliberations "merely explained the order of voting on the outcome of the charged offenses." But the jury's question did not ask whether it could vote or return a verdict on a forcible lewd act count if it was hung on an aggravated sexual assault count. Instead, it asked whether it was "able to consider" the alternate count in that circumstance. Given the similarity between the trial court's response to the jury's question here and the response deemed erroneous in *Kurtzman*, we find the trial court erred.

### 2. The *Kurtzman* Error Affected Counts 10 through 19

We asked the parties for supplemental briefing regarding (1) whether the trial court's instructional error affected all alternate counts (counts 10 through 19), or only the counts explicitly referenced in the jury question (counts 14 and 19); and (2) whether the *Kurtzman* error was prejudicial.

In their supplemental brief, the People argue that any error is limited to counts 14 and 19 because the jury asked only about those counts and, "[i]f the jury wanted to consider the other counts, the note would have referred to other counts as well." But there is no indication in the record that the jury had already resolved the other alternate counts (counts 10 through 13) before asking its question related to count 14, nor is there any indication as to which counts were considered after the court answered the question. It is possible the jury considered count 14 before discussing counts 10 through 13, or that the jury intended counts 14 and 19 to merely serve as an example of the order of deliberations for all alternate counts. In either case, a reasonable juror could conclude that the jury could not *consider* an alternate count if it was hung on the greater count after receiving an unequivocal "No" from the trial court relating to counts 14 and 19. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422 [" 'We presume that jurors understand and follow the court's instructions.' "].) We thus find that the erroneous instruction affected all alternate counts, not just counts 14 and 19.

### 3. The *Kurtzman* Error Was Prejudicial

The *Kurtzman* court applied the *Watson* standard of prejudice to the trial court's error (*Kurtzman*, *supra*, 46 Cal.3d at p. 335), and the Supreme Court later stated in *Berryman* that *Kurtzman* error "appears to implicate California law only." (*Berryman*, *supra*, 6 Cal.4th at p. 1077, fn. 7, overruled on another ground by *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1; cf. *Breverman*, *supra*, 19 Cal.4th at p. 149 [applying *Watson* standard to misdirection claim under Cal. Const., art. VI, § 13].) Based on these authorities, we will apply the *Watson* standard of prejudice.

The People argue that the error was harmless because the "evidence plainly established that the greater offense was committed, not the lesser." But the evidence was not as overwhelming as the People suggest. Minor testified that defendant abused her over several years, but there were discrepancies as to the severity of defendant's misconduct. Minor acknowledged at trial, for example, that she never told Officer Herrera in 2003 that defendant made her orally copulate him. It appears minor first made oral copulation allegations years later when speaking with investigator Katrina Rogers of the District Attorney's Office in 2012. Minor's testimony about the hotel incident (the basis for counts 14 and 19) was also somewhat ambiguous. Minor initially testified at trial that oral copulation had not occurred at the hotel. But after having her recollection refreshed by statements she had made to Rogers, she testified that defendant made her orally copulate him during that incident. Furthermore, the jury's question, of itself, indicated it was hung on count 14 for at least some period of time. Had the trial court correctly instructed the jury it could consider the counts in whatever order it desired, it is reasonably probable the jury would have acquitted defendant of one or more of the aggravated sexual assault counts (counts 10 through 14) and instead convicted him of one or more of the forcible lewd act counts (counts 15 through 19). In *Kurtzman*, the Supreme Court found the error harmless because the record showed the jurors actually considered both the charged counts and the lesser included uncharged counts "despite

21

erroneous guidance from the court." (*Kurtzman*, *supra*, 46 Cal.3d at p. 335.)  Unlike *Kurtzman*, the record here discloses no such consideration of the alternate counts.

The People rely on *People v. Perez* (1989) 212 Cal.App.3d 395 (*Perez*) to argue that any error was harmless.  The trial judge in *Perez* properly instructed the jurors before deliberations that if they could not unanimously determine that Perez was guilty of the charged offense of murder, they could instead find him guilty of a lesser included offense.  (*Id.* at p. 400.)  The jury foreman informed the trial judge that the jurors were deadlocked after four days of deliberations.  The judge then told the jurors (apparently in open court):  " 'I think you're on the right track, in that you must resolve count I, the second degree charge, before you can consider the other charges.  And that's only if you consider a not guilty as to count I.  If you consider—if you can't resolve that, of course, that precludes you from handling any of the lesser offenses.' " (*Id.* at p. 399.)  The jury ultimately convicted Perez of second degree murder.  (*Id.* at p. 397.)

The appellate court in *Perez* determined that the trial court committed *Kurtzman* error but found the error harmless for three reasons.  (*Perez*, *supra*, 212 Cal.App.3d at pp. 399-400.)  First, the pre-deliberation instructions given to the jury "did not preclude the jurors from considering a lesser offense ... ."  Second, the trial judge's statements were somewhat ambiguous because the judge used the word "consider" for its generally understood definition but then, "in the next breath, the court stated, 'And that's only if you consider a not guilty as to count I,' obviously using the word 'consider' to mean to return a verdict and not just to consider."  Third, the jury asked questions about Perez's mental state after the trial judge's incorrect instruction, "and it is unlikely that the jury would, or even could as a practical matter, discuss [Perez's] state of mind without considering" both murder and the lesser included offenses.  (*Id.* at p. 400.)

*Perez* is distinguishable.  Unlike the ambiguous trial court instruction in *Perez*, there was no ambiguity in the trial court's unequivocal "No" in response to the jury's question whether it was "able to consider" an alternate count if hung on the greater count.

22

There were also no additional questions asked by the jury to indicate that it had in fact continued deliberating on alternate counts despite the trial court's incorrect instruction. That the trial court had previously instructed the jury correctly using CALCRIM No. 3518 cannot by itself undo the harm caused by the court's subsequent incorrect response to the jury's question during deliberations.

## III. DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings on counts 10 through 19. This decision does not affect defendant's guilt, or the sentences imposed, for counts 1 through 9 and 20 through 22.

_____

Márquez, J.

WE CONCUR:


_____

 Rushing, P. J.



_____

 Premo, J.




No. H040864
People v. Olivas

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court, Case Nos.: F07574, F24276 |
| Trial Judge: | Hon. John Steven Salazar |
| Attorneys for Plaintiff/Respondent: The People | Kamala D. Harris Attorney General of California |
| | Gerald A Engler, Chief Assistant Attorney General |
| | Jeffrey M. Laurence, Senior Assistant Attorney General |
| | Eric D. Share, Supervising Deputy Attorney General |
| | Aileen Bunney Deputy Attorney General |
| Attorneys for Defendant/Appellant: Jose Rodriguez Olivas | Robert L. S. Angres Attorney at Law under appointment by the Court of Appeal for Appellant |

*People v. Olivas*
H040864