Filed 1/14/26  P. v. Stone CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>FREDUCHI BERNARD STONE,<br>     Defendant and Appellant. | A170725<br><br>(San Mateo County<br>Super Ct. No. 23NF018439A) |

After defendant Freduchi Bernard Stone was convicted of robbery (Pen. Code,[1] § 212.5, subd. (c)), and several misdemeanors, he was sentenced to a four-year prison term.  Stone raises two issues on appeal.  First, he asserts the trial court abused its discretion in admitting evidence of a prior uncharged act pursuant to Evidence Code section 1101, subdivision (b) (section 1101(b)).  Second, he claims the trial court committed reversible error under *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*) by suggesting the jury could not consider the lesser included theft offense while it deliberated on the greater robbery charge.  We affirm.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

## BACKGROUND

### *The Information and Pretrial Matters*

The San Mateo County District Attorney charged Stone by information with four crimes arising out of an incident during which Stone threatened George A.—an asset prevention specialist at the Colma Target—with bodily injury and then exited the store with merchandise for which he had not paid: one felony count of second degree robbery (George A.), a serious and violent felony (§§ 212.5, subd. (c), 667.5, subd. (c), 1192.7, subd. (c)); one misdemeanor count of resisting or obstructing a peace officer engaged in the performance of his duty (Officer Abarca) (§ 148, subd. (a)(1)); one count of using force or violence against an officer (Officer Abarca) (§ 243, subd. (b)); and one count of possession of drug smoking paraphernalia (Health & Saf. Code, § 11364). With respect to the felony count, it was further alleged Stone had four prior felony strikes, all robberies. (See generally § 667, subds. (b)–(i).) The information additionally listed several sentencing circumstances in aggravation. (See §§ 1170, subd. (b)(2); 1170.12, subd. (c)(2).) And it alleged Stone committed the offense while on felony probation within the meaning of section 1203, subdivision (k).

Stone entered not guilty pleas to the charges and denied the enhancing allegations at his arraignment. Several months later, he waived his right to jury trial on aggravating factors and prior convictions. He also entered no contest pleas with respect to the three misdemeanor counts.

### *Jury Trial and Sentencing*

Stone went to trial on the felony count and the jury returned a guilty verdict. The trial court then found true the prior conviction and strike allegations. The court subsequently sentenced Stone to four years in state

prison, comprised of the low term of two years on the felony count, doubled as a second strike, and concurrent two-month terms on the misdemeanors.

## DISCUSSION

### *Admissibility of Prior Acts Evidence*

Stone maintains the trial court erred when it admitted evidence regarding an uncharged theft offense under section 1101(b) to prove intent and lack of mistake. Specifically, he claims the court's admission of the evidence was improper because the theft was not sufficiently similar to the charged robbery. Our standard of review is well established—we review the trial court's evidentiary ruling for abuse of discretion. (*People v. Kelly* (2007) 42 Cal.4th 763, 783 (*Kelly*) [admission of uncharged acts reviewable for abuse of discretion]; accord, *People v. Kipp* (1998) 18 Cal.4th 349, 369.)

#### *Charged Offense (Target)*

At the time of trial, George A. had worked at the Colma Target for almost two years, the last 10 months as an asset protection specialist. His job involved monitoring security cameras and walking the sales floor to observe people in the aisles where the cameras did not provide full coverage. He did not wear a uniform. George A. watched for people rapidly taking multiple items off the shelf; people carrying luggage, backpacks, or bags; and other suspicious activities.

On the day in question, George A. observed surveillance footage of Stone in the men's department rapidly taking items from the shelves and obtaining help from a Target employee to unlock some inaccessible items. Stone also took items from the laundry detergent department. Both areas of the store tend to be highly impacted by theft. When the items in the cart approached a value of $100 or more, and Stone moved off camera, George

3

decided to go to the sales floor to get a closer look. As he watched, Stone took some food items and then headed toward self-checkout.

At the checkout counter, Stone scanned all the items in his cart. However, the light over the self-checkout station never went back on to indicate the transaction had been completed and to permit the next customer to scan their items. To complete a transaction, the customer needs to pay with cash, a card, or by using the store application on their phone. George A. observed Stone with some kind of card in his hand at one point, but no payment went through. While Stone selected the debit/credit card screen, he did not follow its directions. The transaction was still open and unpaid as Stone moved away from the checkout area towards the exit.

Stone then went into the vestibule between the checkout area and the parking lot with the items he had collected in the store. George A. and two security personnel were waiting there, and they had been informed that the transaction had never gone through. George identified himself as Target security, stated Stone had not completed his transaction, and asked him to come back into the store to the asset protection office. Even though George's tone was conversational, Stone's tone, body language, and overall demeanor was aggressive from the start. He refused to follow George's instructions and raised his voice, giving George—who had been assaulted on the job before— concern for his safety and that of his coworkers. Stone then became verbally aggressive, yelling at George, " 'I'm going to punch you in your face.' " George testified he disengaged at that point and allowed Stone to pass out of the vestibule for safety reasons. Security footage from the vestibule shows George and his coworkers standing aside to let Stone into the parking lot after he threatened George. One of the two Target security guards testified

4

he heard Stone angrily tell George he was going to mess him up.  George observed Stone heading toward the bus stop on Junipero Serra.

Stone's location and description were communicated to Colma dispatch, and Colma Police Officer Abarca approached Stone in possession of the Target bags.  According to Abarca, Stone immediately became agitated and fidgety on initial contact, making aggressive hand motions and yelling profanities.  Abarca attempted to detain Stone in handcuffs after he learned Stone had threatened to punch one of the Target loss prevention officers.  Based on their interactions and his own training and experience, Abarca was afraid the incident could escalate to the point of violence.  Although Stone resisted, Abarca was eventually able to handcuff him.  Even after being handcuffed, Stone continued to resist.  He remained uncooperative, refusing to follow instructions, yelling, and swearing.  Eventually, Abarca and another officer had to forcibly put him into a police car.

The bags of goods, which contained the goods scanned by Stone and only those goods, were later returned to George A.  There was no receipt or proof of payment in the bag.  The value of the stolen items was approximately $400.

### *Uncharged Offense (Ross Dress for Less)*

Prior to trial, the prosecution moved in limine to admit evidence of a prior robbery by Stone of a Ross Dress for Less (Ross) under section 1101(b) to prove intent, common plan or scheme, and absence of mistake or accident.  The court initially indicated it was inclined to allow admission of the evidence to prove intent and absence of mistake.  Later, it denied the prosecution's request to admit a certified record of the prior conviction pursuant to section

5

1101(b). Instead, the prosecution was allowed to present testimony from an officer who had interviewed Stone with respect to the prior incident.

Thus, at trial, Officer Rivera—who was an El Cerrito Police Officer during the relevant timeframe—testified he had contacted Stone at the El Cerrito Plaza BART station, having been dispatched to investigate a theft from the nearby Ross clothing store. After advising Stone of his *Miranda*[2] rights and receiving a waiver of those rights, Rivera interviewed Stone at the police station.

According to Stone, he had selected items at Ross and was planning to pay for them with his state benefits (EBT) card at the cash register. However, he had approximately $300 on his EBT card and the items he had selected cost more than that, so he began putting the items he still wanted to buy in bags to separate them from the items that needed to be returned. Since the items Stone was bagging had already been scanned but had not been paid for, the cashier would not relinquish them to Stone and a tug of war ensued. Eventually, Stone gained control of a bag of items. He never used his EBT card; nor did he pay for the items in any other way. Instead, he left the store with the bag of items. When Officer Rivera later went through the Ross bag, he found items with price tags and, in some cases, security devices, attached.

Following Officer Rivera's testimony, defense counsel objected on the record that the Ross theft was not sufficiently similar to meet the criteria for admission under section 1101(b) because, unlike the Ross incident, Stone believed he had paid for the items when he left the Target store. In addition, the prior theft involved force while the current matter alleged only a threat.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

Counsel further argued admission of the prior theft was more prejudicial than probative.

### *Relevant Jury Instructions*

With respect to the uncharged conduct, the jury was instructed with a modified version of CALCRIM No. 375 as follows:

"The People presented evidence of other behavior at the ROSS Store in El Cerrito by the [d]efendant that was not charged in this case.
"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that the fact is more likely than not to be true.
"If the People have not met this burden, you must disregard this evidence entirely.
"If you decide that the defendant committed the uncharged act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:
　　"A. The defendant acted with the intent to deprive Target of the property permanently in this case; or
　　"B. The defendant's alleged actions were not the result of mistake or accident; or
　　"C. The defendant had a plan to commit the offense alleged in this case.
"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged act and the charged offense.
"Do not consider this evidence for any other purpose.
"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.
"If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of robbery or petty theft. The People must still prove the charge beyond a reasonable doubt."

***Legal Framework***

Propensity evidence—that is, evidence of a defendant's bad acts used to prove the defendant's conduct on a specific occasion—is generally inadmissible. (Evid. Code, § 1101.) But evidence of prior conduct is admissible to prove some material fact other than a defendant's disposition to commit an act. (§ 1101(b); *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406.) This includes intent, knowledge, or absence of mistake. (§ 1101(b); *Bryant, Smith and Wheeler*, at p. 406, fn. 27.) To be admissible under Evidence Code section 1101, the evidence must also satisfy the strictures of Evidence Code section 352—i.e., its probative value must not be substantially outweighed by undue prejudice. (*Bryant, Smith and Wheeler*, at pp. 406–407.)

The circumstances under which evidence of uncharged criminal conduct may be admitted under section 1101(b) reflect what the People expect to prove with the evidence. The most stringent circumstances apply when the People seek to prove the defendant's identity as the perpetrator of the charged offense with evidence he or she had committed uncharged offenses. There the admissibility of the uncharged offenses turns on proof that the charged and uncharged offense share such distinctive common features that there arises an inference of identity. This is sometimes referred to as modus operandi evidence or a signature method of commission of the offense. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).) A lesser degree of similarity is required to show a common plan or scheme and even less is required to show intent. To be admissible to show intent, the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance. (*Id.* at pp. 402–403; see *Kelly*, *supra*, 42 Cal.4th at p. 783.)

8

Admissibility also depends on the materiality of the fact sought to be proved, the tendency of the prior criminal conduct to prove that material fact, and whether there is some other rule, such as Evidence Code section 352, requiring exclusion. (*People v. Catlin* (2001) 26 Cal.4th 81, 146.)

### *No Abuse of Discretion on this Record*

Stone maintains the evidence he knowingly left Ross with unpaid items does not prove the essential issue in this case—i.e., whether Stone knew he was leaving the Target with unpaid items.

" 'When the knowledge element is akin to absence of mistake or innocent intent, an inference that defendant learned from his experiences and obtained information that establishes the requisite knowledge requires that the previous experiences be similar to the circumstances presented in the charged case. As our high court has noted, " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) *to negative accident or inadvertence . . .* or *good faith or other innocent mental state*, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act.' " ' " (*People v. Felix* (2019) 41 Cal.App.5th 177, 185, quoting *Ewoldt, supra*, 7 Cal.4th at p. 402.) In other words, "to establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the charged offense to support the inference that what defendant learned from the prior experience provided the relevant knowledge in the current offense." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 242–243.)

In an attempt to show dissimilarity, Stone points out he went to a cashier at Ross, while at Target he went to self-checkout. He also highlights his initial decision at Ross to try to separate out items he wanted when he

realized there was not enough money on his EBT card before he, admittedly, took them without paying. In contrast, he claims he swiped a card at Target and thought he had paid when he left the store. Neither point compels the conclusion the two theft offenses were not sufficiently similar for purposes of Evidence Code section 1101. First, it seems likely use of self-checkout, rather than going to a cashier, represents nothing more than a change in available technology between 2018 and 2023, rather than any material difference in the two incidents. If anything, Stone took the less risky option at Target, refusing to go to a cashier even when he was told by an employee he had too many items for self-checkout, evidence consistent with an evasion of oversight and an intent to steal.

Furthermore, Stone cannot rely on his own unproven assertion that he thought he had paid in Target to argue the two crimes are dissimilar. That is precisely the inference the Ross incident was admitted to address. The trial court was well aware of the dangers surrounding the admission of other crimes evidence in this context, declining to allow the admission of records of conviction for any of Stone's four prior offenses and allowing the prosecution to present only live testimony about Stone's own statements with respect to the Ross theft. With those safeguards, the court was well within its discretion in concluding the Ross evidence was admissible to prove intent and absence of mistake.

In the Ross case, Stone entered a large, budget-friendly retail establishment, gathered a number of in-demand items he could sell or trade in his cart, had the cashier scan them, asserted he had a valid but insufficient form of payment, bagged some of the items, fought with the cashier over the bag, and ultimately left the store without paying. In the instant case, Stone entered a similar retail establishment, gathered a number

10

of in-demand items he could sell or trade in his cart, scanned them at the self-checkout station, presented an insufficient form of payment, threatened store personnel who tried to stop him from leaving, and ultimately left the store with bags full of unpaid items.

We see no meaningful difference between Stone's use of force in one incident and use of threats in the other. Both occurred at the point when a store employee confronted him with the fact he had not successfully paid. Thus, both were designed to stop resistance from store employees and allow him to exit with the stolen goods. The similarities between the two events suggest that Stone was not mistaken about whether his non-credit card, non-debit card, non-gift card could affect payment at the Target store any more than the EBT card he never gave to the cashier at Ross could affect payment there. In neither case was an actual form of payment ever shown to exist. In sum, the Ross offense was sufficiently similar to the Target offense to support an inference that what Stone learned from the Ross offense provided relevant knowledge in the current offense.

Moreover, especially as limited by the trial court, the probative value of this evidence was not substantially outweighed by any unduly prejudicial effect. (*People v. Culbert* (2013) 218 Cal.App.4th 184, 192.) The prior conduct was no stronger or more inflammatory than Stone's charged offense. (*Ewoldt, supra*, 7 Cal.4th at p. 405.) In both instances, he presented a safety risk to employees attempting to stop him from stealing. It is unlikely "that the jury's passions were inflamed" by the evidence of Stone's uncharged offense. (*Ibid.*) We see no error, and certainly no abuse of discretion.

### *No Reversible* Kurtzman *Error*

Stone next claims the combined effect of an improperly modified form jury instruction and the prosecution's closing argument in this case violated

11

*Kurtzman*, *supra*, 46 Cal.3d 322, because the errors assertedly precluded the jury from considering the lesser-included offense of petty theft while it deliberated on the greater offense of robbery. However, even if *Kurtzman* error occurred in this case—a question we need not and do not decide—it was harmless.

### *Legal Framework*

Under the "acquittal-first rule," when a jury is instructed on a lesser included offense, it " 'must acquit of the greater offense before returning a verdict on the lesser included offense.' " (*People v. Anderson* (2009) 47 Cal.4th 92, 114 (*Anderson*).) The rule is meant to enforce double jeopardy protections by avoiding "retrial when the jury agrees that the greater offense was not proven but cannot agree on a lesser included offense. Without the rule, a general declaration of mistrial would disguise the fact that the jury agreed the defendant was not guilty of the greater offense, making the defendant subject to retrial on both the greater and lesser offenses." (*Ibid.*)

In *Kurtzman*, *supra*, 46 Cal.3d 322, our Supreme Court clarified the acquittal-first rule, confirming the rule dictates the order in which a jury returns verdicts, but holding the jury may "consider or discuss the offenses in any order it chooses." (*Anderson, supra*, 47 Cal.4th at p. 114; *Kurtzman*, at pp. 329–330.) The court thereby "rejected a strict acquittal-first rule, applied in some states, 'under which the jury must acquit of the greater offense before even considering lesser included offenses.' " (*People v. Olivas* (2016) 248 Cal.App.4th 758, 773 (*Olivas*).) Pursuant to *Kurtzman*, then, "a trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense." (*People v. Dennis* (1998) 17 Cal.4th 468, 536, citing *Kurtzman*, at pp. 328, 335.) " 'The danger to the defendant of [an instruction] requiring

acquittal of the greater offense before the lesser offense is considered is clear: "If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge." ' " (*People v. Hishmeh* (2020) 52 Cal.App.5th 46, 54 (*Hishmeh*).)

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *Olivas, supra,* 248 Cal.App.4th at p. 772.) In doing so, we view the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Mitchell*, at p. 579; *People v. Taylor* (2018) 19 Cal.App.5th 1195, 1205.)

### *Additional Facts*

The jury was instructed with a modified version of CALCRIM No. 1600 on robbery (see § 211) as well as with a modified version of CALCRIM No. 1800 on petty theft, a lesser included offense of robbery (see § 484).

While instructing the jury with a modified version of CALCRIM No. 3517 regarding how to fill out verdict forms when there are greater and lesser included offenses, the court's oral instruction followed the pattern instruction explaining that if a not guilty determination is made on a greater charged offense, "you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct." However, in its oral and written instructions, the court did not include the following paragraph from the pattern instruction: "It is up to you to decide the order in which you consider the greater and lesser crimes and the relevant evidence. You do not have to reach a verdict on the greater

13

crime before considering a lesser crime. However, I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." (CALCRIM No. 3517.) Additionally, when explaining the order in which the jury should approach the verdict forms with respect to greater and lesser offenses, the court deviated from the pattern instruction, repeatedly informing the jury that it could "consider" the lesser crime of petty theft only if it found appellant not guilty of robbery.

During closing arguments, the prosecutor addressed the meaning of lesser included offenses, paraphrasing the instruction, and observing: "If all 12 of you agree that the defendant is guilty of robbery, then you are done. That's all you do. You sign the guilty form. You are done. You don't even consider the lesser. [¶] All 12 of you have to agree that the defendant is not guilty of robbery before you consider the lesser charged offense of petty theft."

### *Any Error Was Harmless*

As Stone acknowledges, instructional error under *Kurtzman* requires reversal only where it is "reasonably probable that a different result would have occurred" had the jury been properly instructed. (*Kurtzman, supra,* 46 Cal.3d at p. 335; *ibid.* [applying the standard of prejudice adopted in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Berryman* (1993) 6 Cal.4th 1048, 1077, fn. 7 (*Berryman*) [because *Kurtzman* error "implicate[s] California law only," prejudice is shown if the error had " 'a reasonable probability of an effect on the outcome' "], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823; accord, *Olivas, supra,* 248 Cal.App.4th at p. 775 [applying the *Watson* standard in reliance on *Kurtzman* and *Berryman*]; but see *Hishmeh, supra,* 52 Cal.App.5th at pp. 53–55.)

According to Stone, the trial court's *Kurtzman* error in this case was prejudicial because the evidence he knew he had failed to pay was "somewhat ambiguous." Stone further argues the short length of the deliberations—approximately one hour—supports the inference that the jury followed the trial court's erroneous instruction and did not consider the offense of petty theft. He also points to statements from our Supreme Court suggesting an "inherent difficulty" in demonstrating prejudice stemming from *Kurtzman* error. (*People v. Fields* (1996) 13 Cal.4th 289, 309, fn. 7, citing *Berryman*, *supra*, 19 Cal.4th at p. 1077, fn. 7 [finding that "it will likely be a matter of pure conjecture whether [an erroneous instruction under *Kurtzman*] had any effect, whom it affected, and what the effect was"].)

We read the high court's comments as focusing on the difficulties inherent in determining the impact of *Kurtzman* error on unrecorded jury deliberations, not as a suggestion that prejudice (or lack thereof) cannot be found in this context. Indeed, immediately after the language cited above, the *Berryman* court went on to state: "[E]ven if we could conclude that there is a reasonable likelihood that the jury in this case construed or applied the challenged instructions as imposing an acquittal-first rule, on this record we could not conclude that defendant suffered prejudice." (*Berryman*, *supra*, 19 Cal.4th at p. 1077, fn. 7.) In other words, a lack of prejudice can be found where, assuming *Kurtzman* error occurred, it is not reasonably probable the defendant would have obtained a better result absent that error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Such is the case here.

As we have recited, the jury was instructed in this case that, to be guilty of robbery, the prosecution had to prove Stone took property that was not his own from the possession of another person against the person's will "us[ing] fear to take the property or to prevent the person from resisting." In

addition, when Stone used fear, he must have intended to deprive the owner of the property permanently. The jury was further instructed a "store employee who is on duty has possession of the store owner's property." In contrast, the jury was instructed that, to be guilty of petty theft, the prosecution had to prove Stone took possession of property owned by someone else without the consent of the owner or the owner's agent and intending to deprive the owner of the property permanently.

The only difference between the two crimes is the use of fear in the taking of the property. Indeed, the prosecutor highlighted this singular difference in her closing argument. Thus, Stone's argument that the evidence he knew he had failed to pay was "somewhat ambiguous" is irrelevant, as the jury concluded beyond a reasonable doubt that he took property that was not his own intending to permanently deprive the store of it—an element of both robbery and petty theft. Under such circumstances, even if the jury had considered petty theft at the same time it considered robbery, there is no reason it would not have found the knowledge element satisfied for both crimes.

As for the use of fear—the only element distinguishing robbery from the lesser included offense of petty theft—the jury was instructed "fear" in this context "means fear of injury to the person himself or herself or immediate injury to someone else present during the incident or to that person's property." Moreover, "[a]n act is accomplished by fear if the other person is actually afraid. The other person's actual fear may be inferred from the circumstances." Here, George A. testified Stone threatened to punch him in the face if he did not let him leave with the stolen goods. He expressly stated he feared for his safety and the safety of the other two coworkers who were present at the time. One of those coworkers testified, confirming that

16

he heard Stone make a threat. And the video footage played for the jury is consistent with George A.'s testimony, showing the point in the interaction where the threat was made which caused George and his coworkers to step aside and let Stone leave the store. That the threat was made was also corroborated by Officer Abarca's testimony explaining he was informed about the threat shortly after it was made. Finally, Stone's aggression during his arrest by Officer Abarca also tends to support George's description of Stone as immediately aggressive and thus further validates George's fear he would have been harmed had he tried to stop Stone from stealing the Target goods.

In sum, on this record, the evidence Stone used fear when taking the Target property is unequivocal and uncontradicted. Thus, even if the jury had considered petty theft at the same time it considered robbery during deliberations, it is not reasonably probable it would have found insufficient evidence of fear and convicted Stone of petty theft instead.[3]

## DISPOSITION

The judgment is affirmed.

---

[3] Because we conclude any *Kurtzman* error was harmless, we do not consider the Attorney General's alternative arguments that no error occurred, the claim was forfeited, and/or Stone's counsel was not ineffective in failing to object to the instruction either as crafted or as given.

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

A170725, People v. Stone

18