Filed 7/13/20

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057045 |
| v. | (Super. Ct. No. 15WF0292) |
| JOSEPH MICHAEL HISHMEH, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge. Reversed and remanded for further proceedings.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Colleen M. Tiedmann and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

INTRODUCTION

We publish a portion of this opinion as a reminder that *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*) and CALCRIM No. 3517 leave it to the jury to decide the order in which it considers each crime. In this case, after being instructed with CALCRIM No. 3517, the jury asked the trial court how to address lesser included offenses. In its response, the court twice instructed the jury that unless it found the defendant not guilty of the charged crimes, it *could not consider* the lesser included offenses. By doing so, the court erred. Under the circumstances of this case, the error was prejudicial, and we reverse the convictions for the charged crimes in counts 1 and 2 of the information.

In the unpublished portion of this opinion we address the defendant's arguments that incriminating statements he made to the police should have been excluded. For the reasons we explain, the defendant's statements to the police were admissible.

As a result of the prejudicial instructional error, defendant's convictions for two counts of sexual penetration of a child 10 years of age or younger are reversed; the People shall have the option, following issuance of the remittitur, to retry defendant on these counts. Defendant's convictions for the five counts of committing lewd acts on a child under 14 years of age are affirmed. The matter shall be remanded; following issuance of the remittitur, if the People do not bring defendant to trial within the term prescribed by law on counts 1 and 2, the trial court shall resentence defendant on counts 3 through 7.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In February 2015, the Orange County Child Exploitation Task Force executed a search warrant on the house in which defendant, Joseph Michael Hishmeh, was living. Thousands of photographs and videos containing child pornography were seized. (Defendant was not charged in this case with possession of child pornography.)

2

While the search was on-going, Newport Beach Police Officers David Syvock and Kim Speakman interviewed defendant in the garage on the property. At the end of the interview, Syvock told defendant he was being arrested. Syvock read defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and defendant confirmed that he understood each right.

The next morning, Speakman and Orange County Sheriff's Department Sergeant Sandra Longnecker interviewed defendant in the Santa Ana jail. The officers began by again reading defendant his *Miranda* rights, and defendant again confirmed that he understood each of those rights.

Defendant was charged in an information with two counts of using his finger to sexually penetrate the victim (a female child between two and three years of age at the time the crimes were committed) (Pen. Code, § 288.7, subd. (b)) (counts 1 and 2), and five counts of touching her in a lewd or lascivious way while photographing and/or videotaping her (*id.*, § 288, subd. (a)) (counts 3 through 7). Defendant's cousin babysat the victim in the home in which defendant was living. During the interviews in the garage and at the police station, defendant admitted being present when photographs and videos were taken of the victim, and admitted touching the victim inappropriately, although he denied sexually penetrating her with his finger.

Before trial, defendant filed a motion to suppress the statements he made to Syvock and Speakman in his garage on the ground that those statements were elicited in violation of *Miranda*. Defendant also sought to suppress the statements he made to Speakman and Longnecker because he did not voluntarily, knowingly, or intelligently waive his *Miranda* rights. After further briefing, the court conducted an evidentiary hearing on defendant's motion, at which Syvock, Longnecker, and defendant testified. The trial court denied defendant's motion to suppress.

The trial court received into evidence the video and audio recordings of the garage and jail interviews; copies of the corresponding transcripts were provided to the

3

jury to review while the tapes were played but the transcripts were not admitted in evidence. During the interviews, defendant admitted e-mailing some of the photographs and videos to other people. One of the individuals to whom defendant sent photographs of the victim e-mailed back: "[T]hose are great. Anything go inside?" Defendant replied by e-mail: "Just the tip of my finger. Gotta make more and will try to go inside. Do you have any other . . . pics?" Defendant told the officers this penetration had not actually happened, his statement was a "fantasy," and he had made the statement in the hope the recipient would send more photographs of underage children to him in return. The e-mails referenced in the interviews were not admitted at trial.

Videos and photographs of the victim constituting child pornography were admitted at trial. The videos and photographs were all taken with the same device and showed the victim. Relevant to the issues in this case were two photographs "of a prepubescent female's genital area being spread on one side by what purports to be an adult finger." Neither defendant's face nor any identifying marks appears in the photographs.

Defendant did not testify at trial.

Defendant was convicted of two counts of sexual penetration of a child 10 years of age or younger (counts 1 and 2) and five counts of lewd acts upon a child under 14 years of age (counts 3 through 7). The trial court sentenced defendant to two consecutive terms of 15 years to life plus a determinate term of 14 years.

DISCUSSION

I.

*THE TRIAL COURT PREJUDICIALLY ERRED IN ITS INSTRUCTION REGARDING THE CONSIDERATION OF LESSER INCLUDED OFFENSES.*

Defendant argues that the trial court's instruction to the jury that it could not consider the lesser included offenses on counts 1 and 2 until it had found defendant not guilty of the charged crimes (sexual penetration of a child 10 years old or younger)

4

was erroneous and prejudicial.  We review the issue de novo.  (*People v. Olivas* (2016) 248 Cal.App.4th 758, 772-773 (*Olivas*).)

A.

*Factual Background*

Before deliberations began, the trial court instructed the jury regarding the elements of sexual penetration of a child 10 years of age or younger, and that attempted sexual penetration, assault, and battery were lesser included offenses on counts 1 and 2. The court also instructed the jury with CALCRIM No. 3517:  "If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime.  [¶] . . . [¶] It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."

On the second day of deliberations, the jury advised the court it could not agree on verdicts on counts 1 and 2, and requested further instruction on how to address the lesser included offenses.  In court, the jury's foreperson said the jurors were deadlocked 11-1 and that further deliberations would not be helpful.  The foreperson also said that further instruction regarding the meaning of the term "genital or anal opening," might help their deliberations.[1]  The court then made the following statements to the jury:

"The Court:  Let me tell you about the lesser crimes.  Unless you find the defendant not guilty of count 1, you will not consider lesser crimes.  Same as to count 2.

"Juror 159:  That would be unanimous.

---

[1]  CALCRIM No. 1128, with which the jury was instructed, reads in relevant part:  "To prove that the defendant is guilty of [the] crime [of sexual penetration], the People must prove that:  [¶] 1. The defendant engaged in an act of . . . sexual penetration.  [¶] . . . [¶] Sexual penetration means penetration, however slight, of the genital or anal opening of the other person."

5

"The Court: You would have to be unanimous for not guilty before you . . . consider the lesser crimes."

The jurors resumed their deliberations, and ultimately returned with guilty verdicts on counts 1 and 2 for sexual penetration of a child 10 years of age or younger. The court had not provided any further definition of the term "genital or anal opening" before the jury reached verdicts on all counts.

B.

*Forfeiture*

The Attorney General first argues that defendant forfeited this claim of error. "A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response. [Citations.] But this rule obviously cannot apply unless it appears that counsel was aware of the court's response at [or] before the time it was effected. 'Tacit approval' of the court's response, or lack of response, may be found where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. [Citation.] At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.) Defendant and his trial counsel were both present when the trial court made the statements quoted above to the jury, and did not raise any objection thereto.

In *Olivas, supra*, 248 Cal.App.4th at page 772, the appellate court considered the same issue presented here. In *Olivas*, the court concluded that a defendant's failure to object to the inaccurate instruction did not forfeit the right to challenge the error on appeal because the instructional error affected the defendant's substantial rights. (*Ibid.*) We, too, shall consider the merits of defendant's claim despite any alleged forfeiture.

C.

*The Trial Court Erred.*

The trial court errs if it instructs the jury "not to 'deliberate on' or 'consider'" a lesser included offense until the jury has acquitted the defendant of the greater offense. (*Kurtzman, supra*, 46 Cal.3d at p. 335; *Olivas, supra*, 248 Cal.App.4th at p. 774.)

In *Kurtzman*, on the third day of deliberations in a murder case, the jury advised the court it could not reach a verdict on murder, although it could reach a verdict on manslaughter. (*Kurtzman, supra,* 46 Cal.3d at p. 327.) The court instructed the jury: "'I am going to ask you to go back and deliberate on the question of murder in the first degree. I want you to come back to me and tell me if you agree or disagree on that issue. . . . Before you get to the other lesser included offenses, I want to find out if you have unanimously agreed on the original charge, which is murder in the first degree. . . . [T]ell me what the status is on that one charge before we go to the lesser ones.'" (*Id.* at pp. 327-328.) When the jury came back with a verdict of not guilty on first degree murder, the court asked the jury to deliberate on second degree murder. (*Id.* at p. 328.) The jury also deadlocked on that charge. (*Ibid.*)

The jury then sent a note to the court asking: "'Can we find the defendant guilty of manslaughter without unanimously finding him not guilty of murder in the second degree?'" (*Kurtzman, supra*, 46 Cal.3d at p. 328.) The court sent back a note reading: "'No, you must unanimously agree on the second degree murder offense before *considering* voluntary manslaughter.'" (*Ibid.*) The jury returned a guilty verdict on second degree murder the next morning. (*Ibid.*) The Supreme Court in *Kurtzman* held this statement was error and the jury was entitled to consider the crimes in the order it chose. (*Id.* at p. 336.)

In *Olivas, supra*, 248 Cal.App.4th 758, the jury asked if it could consider an alternate count of forcible lewd conduct if it was "'hung'" as to the count of aggravated

7

sexual assault, to which the trial court responded, "'No.'" (*Id.* at p. 772.) In *Olivas*, too, the appellate court held this statement was error. (*Id.* at pp. 774-775.)

The Attorney General attempts to distinguish *Olivas* and *Kurtzman* on the ground that in both of those cases, the jury *asked* the court whether it could consider the lesser included offenses and the court said, "No." In the present case, according to the Attorney General, the jury "simply told the court that 'We need further instructions on what to do regarding the lesser crimes,'" and the court replied that unless the jury found defendant not guilty of the charged crimes it could not "consider" the lesser crimes. There is no substantive difference between the compared exchanges.

In this case, the trial court twice told the jury it could not "consider" the lesser included offenses unless it unanimously found defendant not guilty of sexual penetration of a child younger than 10 years of age. This was error. We therefore turn to the question of prejudice.

D.

*The Error Was Prejudicial.*

The Attorney General argues that when a trial court improperly instructs the jury regarding its ability to consider lesser included offenses before acquitting a defendant of the charged crime, reversal is required only if the defendant establishes a reasonable probability that he or she would have received a more favorable result in the absence of the error. (*Olivas, supra,* 248 Cal.App.4th at p. 776, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant argues the appropriate standard for prejudice is that the error is harmless only if we can say, beyond a reasonable doubt, it did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant relies on *United States v. Jackson* (9th Cir. 1984) 726 F.2d 1466, in which the Ninth Circuit held that an instruction regarding the jury's right to consider the charged crime and the lesser included offense in the order it chooses is necessary to "'ensure[] that the

8

jury will accord the defendant the full benefit of the reasonable-doubt standard.'" (*Id.* at p. 1470, quoting *Beck v. Alabama* (1980) 447 U.S. 625, 634.)

When the jury asked the trial court about considering the lesser included offenses of counts 1 and 2, it advised the court that it was deadlocked 11-1 on the charged crimes. The jury also advised the court that further deliberations were unlikely to be helpful, and it needed further instruction regarding the definition of the term "genital or anal opening." The court did not provide any further definition of that term before the jury reached verdicts on all counts. The element of sexual penetration distinguishes the charged crimes in counts 1 and 2 from their lesser included offenses; the jury was instructed that sexual penetration "means penetration, however slight, of the genital or anal opening of the other person." (CALCRIM No. 1128.) In light of the jury's questions and statements, it is apparent that the issue on which the jury was stuck was whether defendant had penetrated the victim's genital or anal opening.

"The danger to the defendant of the charge requiring acquittal of the greater offense before the lesser offense is considered is clear: 'If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge.'" (*United States v. Jackson, supra*, 726 F.2d at p. 1469.)

The Attorney General argues that because the written instructions contained the proper language regarding when the jury could consider the lesser included offenses, there can be no prejudice. The cases the Attorney General cites to support this argument are ones in which the trial court erred in its oral reading of the instruction, but provided the jury with a written copy of the instruction at or about the same time. (See *People v. Wilson* (2008) 44 Cal.4th 758, 803-804 ["[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control"]; *People v. Osband* (1996) 13 Cal.4th 622, 686-688 [misreading jury

9

instructions did not violate federal Constitution when correct instructions were provided to the jury in writing at the start of deliberations]; *People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1113 ["as long as the court provides accurate written instructions to the jury to use during deliberations, no prejudicial error occurs from deviations in the oral instructions"].)

The present case is different from the foregoing cases because here the trial court's oral misstatements of the law were made in direct response to the jury's question about what to do if it could not reach a verdict on the charged crimes in counts 1 and 2.

The photographic evidence admitted at trial showed an adult finger opening the genitalia of a young female child. (There is no dispute that the child in the photographs is the victim.) During his police interviews, defendant admitted using his fingers to spread the victim's outer genital area and possibly touching her vagina, but denied sexually penetrating her with his finger. Defendant also acknowledged sending an e-mail in which he stated, "Just the tip of my finger" went inside, but insisted that that statement was a "fantasy" and the act had never occurred.

The jury was instructed that in order to find defendant guilty on counts 1 and 2, the People must prove defendant engaged in an act of "penetration, however slight, of the genital or anal opening" of the victim. The jury was also instructed that attempted sexual penetration was a lesser included offense of counts 1 and 2, for which the People would have to prove defendant intended to commit an act of sexual penetration, and took a "direct but ineffective step toward committing" that act.[2]

Based on these circumstances, the only reasonable inference from the jury's request for further definition of the term "genital or anal opening," when the jury was split 11-1, was that one juror did not believe the People had proven sexual penetration. That juror might well have believed defendant had touched the victim's genital area

---

[2] The jury was instructed that simple assault and battery were also lesser included offenses of sexual penetration.

10

inappropriately. But the jury was erroneously instructed not to "consider" the lesser included offenses until defendant was found not guilty of the charged crimes in counts 1 and 2. There is more than a reasonable probability that the outlying juror changed his or her vote to avoid a mistrial on counts 1 and 2, ensuring defendant would face punishment for his crimes. (See *United States v. Jackson, supra*, 726 F.2d at p. 1469.) If the trial court had not made the misstatements of law to the jury, it appears likely the jury would not have agreed unanimously to convict defendant of the charged crimes in counts 1 and 2.

We therefore cannot say beyond a reasonable doubt that, under the *Chapman* standard, the instructional error did not contribute to the verdict. Even under the *Watson* standard, there is more than a reasonable chance or abstract possibility of a different outcome in the absence of the trial court's instructional error. (*People v. Campbell* (2015) 233 Cal.App.4th 148, 165.) The trial court's instructional error was prejudicial, and the convictions on counts 1 and 2 must be reversed.

In light of our reversal of counts 1 and 2 on the basis of instructional error, we need not address defendant's argument that the two consecutive sentences of 15 years to life on counts 1 and 2 constitute cruel and/or unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

## II.

*THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENTS TO THE POLICE.*

### A.

*Factual Background*

### 1.

### The Interview in the Garage

The task force executed the search warrant on the house in which defendant lived at about 8:30 p.m. on February 9, 2015. The officers wore black bullet proof vests identifying them as police, and had their guns drawn. The occupants of the house were ordered outside and patted down.

Defendant and Syvock met in the front yard, where Syvock was guarding the perimeter of the house. Syvock was aware that someone named Hishmeh was "of interest in the execution of th[e] search warrant." During a "casual conversation," defendant told Syvock he had recently travelled to a location that was relevant to the investigation. Syvock told defendant no one was under arrest at that point. Syvock testified that during this initial conversation, defendant was not crying and did not seem to be aggressive or tense. Defendant was calm and did not make any attempt to run away from the premises.

Syvock asked defendant if there was somewhere they could talk and suggested they not speak in the yard where the neighbors could overhear. They ended up in the garage because the house was still being searched. The large garage door was open. Defendant sat on a couch in the back of the garage, facing the open garage door, and Syvock and Speakman sat in chairs across from him. Defendant was not handcuffed, and the officers were not "holding" him. Syvock had removed his bullet proof vest, was in plain clothes, and did not display his weapon.

12

Syvock began the interview by telling defendant he was not under arrest and was free to leave. Syvock explained to defendant "in great detail" why the task force was there, and laid out the case for defendant. During the interview, Syvock asked defendant if there was any place he needed to go, and if he had any plans the officers were keeping him from; defendant said no. Defendant never said he did not want to talk to the officers, never asked for an attorney, and never tried to leave. The officers never told defendant he had to speak with them. Neither officer ever drew his weapon on defendant.

Defendant testified neither officer yelled at him and both were respectful toward him. Syvock testified he was never aggressive toward defendant during the interview, and he never raised his voice. The conversation was "polite." The officers left the garage one or two times to check with the forensics team conducting the search to see if there were additional questions they should ask defendant. No one guarded defendant during those times, although defendant testified that officers in the driveway told him to sit down when he got up off the couch.

At one point, defendant asked to call his mother, but the officers refused to give him back his cell phone and suggested he find a landline to use instead. The interview lasted over an hour. At the end of the interview, Syvock arrested defendant and read him his *Miranda* rights from a preprinted card. After he was *Mirandized*, defendant continued to answer the officers' questions. Defendant never asked for an attorney.

Defendant was 21 years old at the time he was interviewed by the police. He had never previously been arrested, or even stopped and questioned by the police. Defendant was in special education classes in the third grade, but graduated from high school where he was in regular classes.

13

2.

The Interview at the Police Station

At about 2:00 or 2:30 p.m. the day after the search and the interview in the garage, Longnecker and Speakman interviewed defendant at the Orange County jail. The door to the room was closed for privacy reasons, and no one else was inside the room. Longnecker was not carrying a weapon and was dressed in plainclothes. Defendant was not handcuffed. Neither Longnecker nor Speakman threatened defendant and neither told him he had to speak with them.

Speakman began the interview by telling defendant they knew a lot of the things defendant had said the night before were not true, and that the best thing defendant could do would be to "put everything out there." Speakman said the officers wanted to get defendant's side of the story to make sure things were not any worse for him, and that while defendant did not have to talk to Speakman and Longnecker, if he did not they would assume the worst.

Longnecker used a preprinted card to read defendant his *Miranda* rights. Longnecker did not thereafter ask defendant, "are you still willing to speak with us?" Longnecker believed defendant impliedly waived his *Miranda* rights by answering the officers' questions. Defendant did not ask for an attorney at any time during the interview. Longnecker described the interview as polite, cordial, and calm. The officers did not raise their voices, behave aggressively, or make a show of force against defendant. At the hearing on the suppression motion, defendant did not testify regarding the jail interview.

3.

The Trial Court's Ruling on the Motion to Suppress

The trial court denied the suppression motion in a written order stating:

"The court has reviewed all the media and all the audio (except where the audio was duplicative of the video) and finds that:

14

"The initial portion of the interview was voluntary. There was no evidence of threats or enticements to induce the defendant to speak or waive his rights. There were areas where . . . [Syvock] and Speakman told the defendant that they wanted to figure out if he was the type of pedophile that would 'commit' to no longer acting a certain way. An unconvincing argument could be made that there were overtones of leniency in those portions, but this court finds otherwise.

"The initial portion of the interview is not subject to *Miranda* as the court finds that the defendant was not under arrest for purposes of *Miranda* analysis although per defendant's testimony, there may be detention. Those are two separate tests. He was told at least twice that he was not under arrest and that he was free to leave. No other factors associated with an arrest were present.

"The second portion of the interview at the house was voluntary for the same reasons and he was duly *Mirandized* and waived those rights. *Missouri v. Seibert* (2004) 543 U.S. 600 is inapposite here. It does not control based on the court's finding regarding the initial portion.

"After a *Miranda* compliant interview, prior to the appointment of counsel, a defendant may be re-interrogated without re-advisement if both interrogations are reasonably contemporaneous with each other. The approximate break in time of seventeen hours complies with that as a matter of law. *People v. Mickle* (1991) 54 Cal.3d 140. Regardless, despite some initial throat-clearing by the interrogating officers, the defendant was re-advised of his rights and voluntarily waived them. Again, being entirely on video, the court found nothing that the defendant was threatened, forced, or enticed to speak or waive his rights."

B.

*Analysis*

1.

Defendant Was Not in Custody in the Garage.

*Miranda* warnings are required only when a person is in custody. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) A person is in custody for purposes of *Miranda* when he or she is formally arrested or when subject to a restraint on freedom of movement of the degree associated with a formal arrest. (*Ibid.*) Whether defendant was in custody during the interview in the garage is a mixed question of law and fact. (*Ibid.*) We consider the circumstances surrounding the interview, and then consider whether a reasonable person would have felt he or she could have terminated the interview and left, given those circumstances. (*Id.* at pp. 401-402.)

Defendant's opening brief points to the following circumstances surrounding the garage interview as evidence that he was in custody: (1) when the search warrant was executed, a large number of police officers entered the house with their guns drawn, forced defendant outside, and patted him down; (2) Syvock knew defendant was identified in the search warrant; (3) defendant was not allowed to go back in the house or to talk with the officers in the yard; (4) Syvock suggested talking in the garage; (5) the officers would not let defendant use his cell phone to call his mother during the interview; (6) the length of the interview; and (7) the officers confronted defendant with evidence of guilt and manifested a belief that he was guilty, controlled the course of the interview, and arrested him at the end of the interview.

On the other side of the coin, the officers told defendant multiple times that he was not under arrest, asked if he needed to leave, conducted the interview on a couch in the garage of the home in which defendant lived, did not brandish their weapons, did not handcuff defendant, and did not yell at him.

16

Having independently reviewed the circumstances surrounding the interview in the garage, we conclude that defendant was not in custody during the interview, and *Miranda* warnings were therefore not required. As the court noted in its written order, an argument could be made that defendant was detained. However, the overall tone of the interview, the fact that defendant was told at least twice that he was not under arrest and could leave, the lack of any physical restraint, the location of the interview on a couch in the garage of the home in which he lived, and the admitted lack of any threats or raised voices by the officers support the trial court's finding that defendant was not in custody, and his statements to the police were admissible despite the lack of *Miranda* warnings.

2.

Defendant's Statements Were Not Involuntary or Coerced.

Defendant next argues that his statements to the police were coerced and involuntary. "In determining whether a defendant's will was overborne in a particular case, the [United States Supreme Court] has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 225-226.) If a confession is elicited by a promise of leniency, it is involuntary and inadmissible. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 311.) "[A]dvice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." (*People v. Jimenez* (1978) 21 Cal.3d 595, 611.)

Defendant points to the following statements by the officers during the garage interview as evidence that defendant's confession was elicited by promises of leniency:

(1) Syvock: "I just wanna make it clear that the reason that we're here right now is—and I told you before that, you know, we deal with children, um, we . . .

17

interview people that are, like, super bad people that are out there grabbing kids off the street and, you know, pullin' them in the bushes and stuff like that and there's other people that we interview that simpl[y] made a mistake, you know, uh, uh, it was somethin' that they were curious about and the opportunity was there and they thought, aw, you know what, but they're not the type of people that are grabbin' kids off the street."

(2) Syvock: "[W]hat we're looking for at the end of our discussion with the person that we're talking to is a commitment that the mistakes that they made, they're not gonna continue to make those mistakes. And I've been doin' this for a long time. [Speakman]'s been doin' this for a long time, uh, we know that somebody that is honest during our discussion, uh, when it comes time to makin' that commitment, they're a lot more sincere about makin' that commitment than somebody that's lying to us."

(3) Syvock: "[I]f you sat here during this discussion and, you know, we ask questions we already know the answers to and you lie to us, you just tell us bold face lies and stuff like that and—and we know from what we have in our investigation here and then when we say, hey, are you ever gonna do this again and you're like, no, we'd both be sittin' there goin', really, come on, you just lied to us all night. Opposed to the person that sits here and talks about the mistakes they made, uh, openly and—and honestly and we find out why we made those mistakes and then we ask for that commitment, hey, are you gonna do this anymore, and you said, I'm not gonna do it anymore, I'm, you know what, I made a mistake, I feel more comfortable leaving at that point, uh, knowing that that person is sincere about never doin' what he was doin' again."

(4) Syvock: "[W]e have a search warrant that was signed by a judge tonight . . . sayin' hey, you need to go out there and find out what's goin' on, you know, is this somebody that is lookin' to seriously hurt a kid or is this somebody that made a stupid mistake. . . . But, you know, what we're looking for is, um, somebody that's

18

willing to take responsibility for the mistakes they've made, talk to us about why they made those mistakes and we find out how we can move forward from this point."

(5)  Speakman:  "[W]e're not gonna judge you no matter what you say."

(6)  Syvock:  "I don't wanna miss that golden opportunity.  So, is there anything else that—that you haven't told us yet that you think you probably should that maybe you don't feel comfortable about before we leave here tonight?"

As our Supreme Court has explained:  "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . .  [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity.  On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.  The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear."  (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

The cases relied on by defendant differ factually from the present case.  In *People v. Cahill, supra*, 22 Cal.App.4th at page 314, the police officer told the defendant he could avoid a first degree murder charge by telling what had actually occurred, which was "an implied promise that if the defendant did admit a role in the killing but had not premeditated he might avoid trial and conviction of first degree murder."  The officer also told the defendant the death penalty was out of the question, without mentioning the likelihood that felony murder was a potential issue against the defendant.  (*Id.* at p. 315.)

19

The officer's "account of the law of murder was materially misleading in omitting any reference to the felony-murder doctrine. The deceptive omission made more plausible the implicit promise that a first degree murder charge might be avoided if there were a confession showing no premeditation. The promissory character of the representations was enhanced by Bell's repeated assertions that he was present to help defendant. Also enhancing the implication of leniency in return for a statement were the repeated remarks about showing remorse and the implication that Bell would testify favorably about remorse if defendant would talk." (*Ibid.*)

In *People v. Jimenez, supra*, 21 Cal.3d at page 613, the officer told the defendant he could receive the death penalty but his codefendant probably would not, although the officer knew that the codefendant had committed the murder while the defendant was unarmed. The court concluded that the officer's statements "carried with them the clear implication that by cooperating and telling what had actually happened, the defendant could possibly avoid getting a worse punishment than his codefendant because either the jury or court might treat him with leniency and not sentence him to death." (*Ibid.*) The uncontradicted evidence indicated that the defendant's confession was motivated by the benefits implied in the officer's remarks, thereby making the confession the product of either express or implied leniency, and involuntary. (*Ibid.*)

We have reviewed the officers' statements to defendant, both on their own and in the context of the full interview in the garage. The statements were, with one exception, made at the start of the interview, before the officers had asked defendant any questions about the offenses. Once the officers started asking defendant questions, he denied any involvement in creating any pornographic images, placing any blame on the previous owner of his computer. Only much later in the interview did the officers begin to wear defendant down and slowly get him to begin admitting his wrongdoing. For defendant's appellate argument to have merit, we would have to assume that, after denying his innocence for up to an hour, despite pointed questions about his involvement,

20

defendant remembered the earlier offers of "leniency" by the officers and decided to confess.

Further, here, defendant was 21 years old, had graduated high school, and was employed, despite his testimony at the hearing on the suppression motion that he was in special education classes in the third grade. There is nothing in the transcript of defendant's interviews with the police that shows he was not fully cognitively aware, or that he was confused or harassed by the officers.

Most importantly, the officers did not make express or implied statements of leniency, express or implied promises that defendant would avoid prosecution or be prosecuted for a less severe crime, or express or implied promises that defendant's sentence would be lessened if he confessed. Nothing in the foregoing statements by the officers goes beyond proper police interrogation and into improper coercion. (*People v. Spears* (1991) 228 Cal.App.3d 1, 27-28.) We conclude that the trial court did not err in determining that defendant's statements were made voluntarily and without coercion, and therefore were admissible.

3.

The Officers Did Not Use an Improper Two-step Procedure to Avoid *Miranda*.

Defendant also argues that his statements made after being *Mirandized* were inadmissible under *Missouri v. Seibert* (2004) 542 U.S. 600, 604 (*Seibert*), in which the Supreme Court held that police officers may not conduct custodial interrogations without *Miranda* warnings, then advise the defendants of their rights, and then reinterrogate the defendants to obtain the same information. The Supreme Court held that under such circumstances, the resulting confessions would be inadmissible, despite being made post-*Miranda*. (*Ibid.*)

As explained *ante*, the interview in the garage was not a custodial interrogation, and *Miranda* warnings were not required. Additionally, there is nothing in the record supporting an argument that Syvock and Speakman intentionally conducted

21

the garage interview so as to circumvent *Miranda*. Therefore, the portion of the garage interview occurring after defendant was *Mirandized* and the in-custody interrogation the next day at the police station were not inadmissible under *Seibert, supra,* 542 U.S. 600. (*United States v. Thompson* (7th Cir. 2007) 496 F.3d 807, 811 [*Seibert* does not apply when the defendant's first interview is noncustodial].)

If, following the issuance of the remittitur, the People decide to retry defendant on counts 1 and 2, the statements he made during his police interviews shall be admissible.

### DISPOSITION

Defendant's convictions on counts 1 and 2 are reversed. Defendant's convictions on counts 3 through 7 are affirmed. Following issuance of the remittitur, if the People do not bring defendant to trial within the term prescribed by law on counts 1 and 2, the trial court shall resentence defendant on counts 3 through 7.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

22