Filed 2/22/22  P. v. Garcia CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>CARLOS GARCIA,<br><br>    Defendant and Appellant. | A164265<br><br>(Kern County<br>Super. Ct. No. BF172406A) |

Defendant and appellant Carlos Garcia (appellant) appeals following his conviction of first degree murder and other charges.  He contends that his trial counsel's failure to request a pinpoint instruction on provocation constituted ineffective assistance of counsel, that insufficient evidence supports the jury's finding the murder was in the first degree, and that denying him the opportunity for a youth offender parole hearing violates his constitutional right to equal protection of the laws.  We affirm.[1]

PROCEDURAL BACKGROUND

In July 2018, the Kern County District Attorney filed an information charging appellant with premeditated murder (Pen. Code, § 187, subd. (a);

---

[1] The present appeal was originally filed in the Fifth District Court of Appeal and assigned case number F079744.  It was transferred to this court by order of the California Supreme Court.

count one);[2] possession of a firearm by a felon (§ 29800, subd. (a)(l); count two); and unlawful possession of ammunition (§ 30305, subd. (a)(l); count three). The information further alleged as to count one that appellant personally used and deliberately discharged a firearm causing death (§§ 12022.5, subd. (a), 12022.53, subd. (d)), and that he had previously been convicted of a serious felony (§ 667, subd. (a)). It was alleged as to all counts that appellant had suffered a prior strike conviction within the meaning of the "Three Strikes" law (§ 667, subd. (c)–(j)).

The jury found appellant guilty on all counts, finding the murder in the first degree and the firearm enhancement allegations true. The trial court subsequently found the prior offense allegations true. The court sentenced appellant on count one to a term of 25 years to life, doubled under the Three Strikes law (pursuant to section 667, subdivision (e)), plus 25 years to life for the firearm enhancement (pursuant to section 12022.53, subdivision (d)), and plus five years for the prior serious felony (pursuant to section 667, subdivision (a)). The aggregate sentence was an indeterminate term of 75 years to life, plus a determinate term of 5 years, for a total of 80 years to life. The terms on the remaining counts were stayed pursuant to section 654.

The present appeal followed.

FACTUAL BACKGROUND

<u>The Prosecution's Evidence</u>

In May 2018, the victim, Alyson Muniz, lived in Blanca A.'s garage in Bakersfield with her three young children. Blanca A. lived in the house with her four sons and her daughter. Blanca A.'s husband occasionally stayed at the house, and appellant, who was dating Muniz, sometimes stayed in the garage with Muniz.

---

[2] All undesignated statutory references are to the Penal Code.

2

A few days or up to a week and a half before the shooting, appellant punched and broke a living room window at Blanca A.'s house. She banned appellant from the house and told her husband about the incident. Shortly thereafter, Blanca A.'s husband beat appellant up.

On May 19, 2018, appellant sent Muniz several threatening audio messages on Facebook. Appellant told her, "I'll let your dumb ass feel the fucking hurt bitch." He said, "I'm really gonna end up not ever getting with you ever again or talking to you dude like, I mean I don't even want to talk to you right, I don't want to see you, I don't, to be honest I don't even want to hear that you're breathing. That's how much, how I feel about you." Later he told her, "But go ahead dumb ass, keep lying. Keep lying to the next boyfriend and then the next one and then the next one and then the next one till that fucking one that just gets pissed the fuck off ends up murking your bitch ass. Because that's what I hope happens since you're just a fucking lying sack of shit."[3] He also threatened to shoot himself in the head. Muniz responded, "Just remember I love you . . . . And I'm always going to be here. I can't believe you're going to hurt me."

On May 20, 2018, appellant sent Muniz a Facebook message stating that if she tested positive for "dope" she would "feel so much fukn pain n the pain will not be like the lil pain u usually get this one best believe u will regret ever smoking that shit." Later he wrote, "Just know bitch I'm going to torture ur friends entire lil family they have there."

On May 21, 2018, Muniz told Blanca A. that appellant had a gun. She did not seem afraid. On May 22, at around 7:00 p.m., Blanca A.'s daughter D. came into Blanca A.'s room to tell her that appellant had come over. About

---

[3] A police detective testified that "murking" is slang for "killing." When appellant testified, he agreed.

3

30 minutes later, Muniz came to Blanca A's room and Blanca A. told her appellant was not allowed in the house. Blanca A. said it was okay if they were outside. Muniz gave Blanca A. her phone to hold for her. Shortly afterwards, D. saw appellant and Muniz on the front lawn.[4] Muniz called her over, but appellant told her not to come. Muniz then stood and ran past D. into the house. Appellant followed, running past Blanca A.'s son J.,[5] who was playing in the living room.

D. saw appellant point a gun at Muniz. A loud sound followed and both children saw appellant standing over Muniz, who was on the ground bleeding. J. saw appellant holding a black pistol. Appellant fled.

Muniz was taken to a hospital and died. A forensic pathologist concluded that Muniz died from a single gunshot wound to the head. Muniz could have been standing, falling, or lying on the ground at the time of the shooting. Due to soot in the wound, it appeared the barrel of the gun had been fired from between a few inches to less than two feet away. The killing could have been unintentional.

Appellant was arrested at the end of May 2018. When interrogated by the police, he said he brought the gun when he went to see Muniz because he was nervous Blanca A.'s husband and son would "jump" him again. When he met up with Muniz on the day of the shooting, he, Muniz, and her sons walked around the block a couple of times. He and Muniz argued because he really did not want to be there. Before she ran into the house, Muniz said "we'll see what [Blanca A.'s husband and son] think about this." He chased after her, and he grabbed his gun because it was falling from his waistband. Muniz hit him, he pushed her, and she fell to the ground. The gun may have

---

[4] D. was nine years old at the time of her testimony in October 2019.
[5] J. was 11 years old at the time of his testimony in October 2019.

gone off when he blocked her punches; he heard the gunshot as she was falling.

The jury also heard evidence regarding a 2017 incident during which appellant forced himself into his ex-girlfriend's car and hit her in the head shortly after she broke up with him.

Appellant's Testimony

Appellant testified he was a methamphetamine addict, having started using the drug at age 13. He started dating Muniz in September 2017. In 2018, he was using methamphetamine every day; he was homeless but sometimes he would stay with Muniz or his sister. In May 2018, he engaged in a fight with Blanca A.'s husband and son after he accidentally broke a window at Blanca A.'s house. Appellant's arguments with Muniz were usually about infidelity and his drug use; he was upset because he believed she was "talking to" several other men, including one of his cousins. The threatening statements he made on Facebook were the result of his methamphetamine use; he made the statements while he was high on the drug and he had not been sleeping for almost four weeks before the shooting. He did not intend to follow through on any of his threats.

Appellant testified he obtained the gun used to kill Muniz from his sister's residence on the day of the shooting. Muniz asked him over; he had already used methamphetamine and he used more on the way over. He had the gun to dissuade Blanca A.'s husband and son if they tried to "jump" him again. Before he met up with Muniz, the gun accidentally discharged in an alley while he was trying to adjust it in his waistband.

After he met up with Muniz, they walked around the neighborhood with her boys and then sat on the grass in front of Blanca A.'s house. During the walk, Muniz was upset with him because he was high. Later, Muniz said

5

she had received a message on her phone from appellant's sister, who was mad at appellant about something. Appellant wanted Muniz to bring him her phone so he could contact his sister, but she refused. He became "a little bit" "upset" because he believed she did not want him seeing that she was "talking to" people. He was angry with her because he suspected her of cheating on him.

When Muniz asked D. to come over, appellant told her not to come because he and Muniz were "having a conversation." Muniz told appellant she was going to see what Blanca A.'s husband and eldest son "think about this," and she got up and ran into the house. He ran after her because he "didn't know what she was going to be trying to tell" them.

Appellant followed Muniz into the house. While he ran, the gun was slipping from his waistband, so he grabbed the handle. They ended up in the kitchen and Muniz "started swinging on" him. Appellant blocked the punches while holding onto the gun, which had slipped out of his waistband. Muniz fell down; the gun apparently accidentally discharged as she fell. He then fled.

## DISCUSSION

I. *Appellant Has Not Shown Ineffective Assistance of Counsel*

Appellant contends his trial counsel was ineffective because counsel failed to request a pinpoint instruction on second degree murder by provocation. Appellant has not shown ineffectiveness of counsel (IAC).

6

A.    *Legal and Factual Background*

" ' "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.] . . . Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel." ' " (*People v. Brown* (2014) 59 Cal.4th 86, 109.)  "[T]he duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests." (*People v. Hussain* (2014) 231 Cal.App.4th 261, 270.)  "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

Appellant argues trial counsel provided ineffective assistance in failing to request that the court give CALCRIM No. 522, "Provocation: Effect on Degree of Murder."  CALCRIM No. 522 provides in relevant part, "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"  To address appellant's claim it is necessary to briefly summarize the law of murder and manslaughter.

" ' "Homicide is the killing of a human being by another...." ' [Citation.] Criminal homicide is divided into two types: murder and manslaughter. 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.) 'Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' [Citation.] A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942 (*Beltran*).)

"Manslaughter is a lesser included offense of murder. (§ 192; [citation].) The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to [voluntary] manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an

8

intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran, supra*, 56 Cal.4th at pp. 941–942.)

Although a defendant who kills without *adequate* provocation is guilty of murder rather than voluntary manslaughter, any evidence of provocation is relevant in determining whether the defendant is guilty of first or second degree murder. (See *People v. Rivera* (2019) 7 Cal.5th 306, 328; *People v. Rogers* (2006) 39 Cal.4th 826, 877–878.) CALCRIM No. 522 is a pinpoint instruction that directs the jury to consider any provocation "in deciding whether the crime was first or second degree murder." (See *Rogers*, at pp. 877–878 [stating that analogous CALJIC instruction instructs jury "that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder"].)

The final relevant charge is involuntary manslaughter. " 'An essential distinction between second degree murder based on implied malice and involuntary manslaughter based on criminal negligence, is that in the former the defendant subjectively realized the risk to human life created by his conduct, whereas in the latter the defendant's conduct objectively endangered life, but he did not subjectively realize the risk.' " (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704.)

In the present case, the trial court gave instructions on excusable homicide by accident; involuntary manslaughter due to criminal negligence; voluntary manslaughter (on the sudden quarrel/heat of passion provocation theory); and murder, including that first degree murder required proof appellant "acted willfully, deliberately, and with premeditation." Defense

counsel did not request and the trial court did not give the CALCRIM No. 522 pinpoint instruction.

The main thrust of defense counsel's closing argument was that the shooting was accidental, which was consistent with appellant's statements to the police and his testimony at trial. He also argued there was no evidence the killing was planned, which was also consistent with the accident defense. Regarding second degree murder and voluntary manslaughter, defense counsel effectively argued that the evidence that the shooting was an accident showed that appellant did not act with malice or even a provoked intent to do harm. In reference to second degree murder, he told the jury, "[R]eaching implied malice is very close to having to find an intent to kill just because of how the events played out that if he actually knew that his act was dangerous and was consciously disregarding it, he would basically have to have the intent to kill given that he had the firearm and they were in close proximity and I've gone through all the reasons why he did not." He argued appellant was innocent of voluntary manslaughter for the same reason. He did *not* argue that, if the jury rejected the accident defense, the jury should convict appellant of only voluntary manslaughter or second degree murder because the evidence showed appellant acted based on provocation rather than with the deliberation necessary to support a conviction for first degree murder. Instead, defense counsel asked the jury to convict appellant of involuntary manslaughter. He told the jury, "[I]t has to be proved he acted in a reckless way creating a high risk of death or great bodily injury. It's clearly established here."

B.    *Analysis*

Appellant contends trial counsel's representation " ' "fell below an objective standard of reasonableness" ' " (*Brown*, *supra*, 59 Cal.4th at p. 109)

10

because he relied solely "on a theory of involuntary manslaughter, which rested on the jury's acceptance of the proposition that appellant did not know his act was dangerous to human life." Appellant argues that theory was very weak because defense counsel had to acknowledge to the jury "that the evidence showed appellant knew there was a round in the chamber, the safety was not engaged and earlier in the day he had almost shot his foot off under the same conditions."

In this case, the defense rested on the theory that the shooting was an accident. In this context, appellant has not shown counsel's failure to request a pinpoint instruction on the provocation theory of second degree murder was objectively unreasonable. Although counsel had a duty to request all instructions "necessary to explain all of the legal theories upon which [the] defense rests" (*People v. Hussain, supra,* 231 Cal.App.4th at p. 270), appellant cites no authority counsel could have had no legitimate tactical reason to forgo a pinpoint instruction *inconsistent* with the defense theory.

In *People v. Wader* (1993) 5 Cal.4th 610, the California Supreme Court rejected an analogous IAC claim. There, the defendant contended his trial counsel was ineffective in failing to request an instruction on voluntary intoxication, where the defendant's "version of events was that he specifically intended not to kill the victim when he shot her." (*Id.* at p. 643.) Because "[a]n instruction on voluntary intoxication as negating specific intent would have been inconsistent with defendant's theory of the case," the court held it could not "say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*Ibid.*; see also *People v. Olivas* (2016) 248 Cal.App.4th 758, 771 [no IAC in failing to request voluntary intoxication instruction that would have been inconsistent with the defendant's claim he did not engage in the alleged sexual misconduct].)

11

The same reasoning applies in the present case.  Appellant's IAC claim on direct appeal fails.

II.     *There Was Sufficient Evidence to Support the Verdict*

Appellant contends there was insufficient evidence from which a reasonable jury could have found beyond a reasonable doubt that appellant's killing of Muniz was deliberate and premeditated.  We disagree.

A.      *Legal Background*

"In evaluating a claim that a conviction lacks sufficient evidence, ' "we review the whole record to determine whether ... [there is] substantial evidence to support the verdict ... such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' "  (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019 (*Wear*).)

Murder is the unlawful killing of a person with malice aforethought. (§ 187, subd. (a).)  First degree murder is murder committed by certain enumerated means including, as relevant here, a "willful, deliberate, and premeditated killing."  (§ 189, subd. (a).)  " 'The very definition of "premeditation" encompasses the idea that a defendant thought about or considered the act beforehand.'  [Citation.]  'Deliberate' means ' " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."  [Citation.]' [Citation.]" ' [Citation.]  Thus, ' "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' "  (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264 (*Boatman*).)  However, " ' " '[t]he process of

premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " ' " (*Id.* at p. 1265.) There is a " 'presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree,' " and therefore " '[a reviewing court] must determine in any case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation] or whether it "leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation." ' " (*Ibid.*)

"Our Supreme Court has identified three categories of evidence to consider when determining whether a murder was deliberate and premeditated: planning activity, motive, and the manner of the killing. [Citation.] When the record contains evidence in all three categories, the verdict is generally affirmed. [Citation.] But those categories or factors are not exclusive or determinative—they are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of the defendant's preexisting reflection and not the result of an unconsidered or rash impulse. [Citation.] 'A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner.' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 492 (*Pettigrew*).)

B.    *Analysis*

As to planning evidence, appellant argues that "[t]he only evidence of planning was that appellant acquired a firearm and ammunition and thereby brought a loaded gun to his visit with Alyson," and that the evidence supported appellant's testimony he had the gun for self-defense.  He also argues that appellant spent considerable time walking and talking with Muniz before shooting her, and that it did not reflect planning for appellant to shoot Muniz in front of people who could identify him and for him to tell Muniz he had a gun.  As to motive evidence, appellant argues that, although appellant expressed concern Muniz was cheating on him, "[a]ppellant had no credible evidence that she was seeing other men and the evidence provides little basis to believe that he made a cold calculation to kill her based on nothing but suspicions."  Finally, as to the manner of killing, appellant argues the "one fatal shot at close range" after a "very brief physical tussle" "offers no evidence supporting a finding of deliberation or premeditation."

We agree with appellant that the manner of killing was not probative on the question of whether the killing was deliberate and premeditated.  As in *Boatman*, *supra*, 221 Cal.App.4th at page 1268, the "manner of killing supports the finding of malice necessary to convict defendant of murder.  To support *first degree* murder, however, the prosecution must show more than an intent to kill."  (Cf. *Pettigrew*, *supra*, 62 Cal.App.5th at pp. 494–495 [manner of killing probative where evidence showed killing " 'occurred in stages' " with "multiple means" and "over a sufficiently prolonged period to allow defendant to reflect on his actions"].)  However, we disagree with appellant's analysis of the evidence of planning and motive.

As to planning, although a jury could have accepted appellant's testimony that he had the gun in self-defense, the jury also could have

14

rejected that testimony and inferred that his possession of the gun was evidence he was contemplating killing Muniz. As to motive, we disagree with appellant's assertion that we can ignore the strong evidence appellant was violently angry over his suspicions of infidelity because there is no evidence Muniz was actually cheating on him. The very threatening Facebook communications, which led Muniz to comment "I can't believe you're going to hurt me," are powerful evidence that appellant had a motive to kill. Of course, appellant was acting in an unreasonable and paranoid manner—possibly under the influence of methamphetamine—but appellant does not argue that negates the evidence of premeditation and deliberation. " ' "[T]he law does not require that a first degree murderer have a "rational" motive for killing." ' " (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 495.)

We note that the evidence does not reflect that appellant had a *definite* plan to kill Muniz on May 22, 2018. If so, he might have killed Muniz before they returned to Blanca A.'s house, where there were many witnesses who knew him. But the evidence does support inferences that appellant considered killing Muniz before meeting up with her on the day of the shooting and that he came prepared with a gun in case he decided to go through with it. The jury could further infer that Muniz failed to satisfy appellant's concerns over her purported infidelity and that he made a rapid but calculated decision to kill, as he was prepared to do and as he had warned her he might do. (See *People v. Young* (2005) 34 Cal.4th 1149, 1183 ["the jury could infer that defendant 'considered the possibility of murder in advance' "].)

Substantial evidence supports the verdict of first degree murder.

III.     *The Exclusion of Three Strikes Offenders from Youth Offender Parole*
         *Hearings Does Not Violate Equal Protection*

Appellant was 24 years old when he committed the instant offense. Pursuant to section 3051, subdivisions (a) and (b), offenders 25 years of age and younger at the time of their offense are eligible for a youth offender parole hearing after 15, 20, or 25 years in prison, depending on the sentence. (§ 3051, subds. (a)–(b).)  However, section 3051, subdivision (h) provides that certain youth offenders—including those sentenced pursuant to the Three Strikes law, such as appellant—are ineligible for youth offender parole hearings.[6]  Appellant argues this differential treatment of Three Strikes youth offenders violates his right to equal protection of the laws.

"The federal and state constitutional guarantees of equal protection of the laws require, generally, that ' " 'persons similarly situated with respect to the legitimate purpose of the law [should] receive like treatment.' " [Citation.]  "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citation.]' [Citation.]  If this showing is made and, as here, the different treatment implicates no suspect class or fundamental right, a defendant must further show that there is no rational basis for the different treatment."

_____

[6] Section 3051, subdivision (h) provides: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age.  This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 26 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison."

(*In re Woods* (2021) 62 Cal.App.5th 740, 751, review granted June 16, 2021, S268740.)

In *People v. Wilkes* (2020) 46 Cal.App.5th 1159 (*Wilkes*), this court rejected the claim made by appellant in the present appeal. There, the jury found the defendant guilty of, among other offenses, attempted murder and found true an allegation the murder was committed willfully, deliberately, and with premeditation. (*Id.* at pp. 1163–1164.) The defendant admitted prior conviction allegations, and the court sentenced him pursuant to the Three Strikes law to a term of 59 years four months to life. (*Id.* at p. 1164.) On appeal, the defendant, who was 25 years old when he committed the offenses, raised an equal protection challenge to section 3051, subdivision (h), arguing that he was similarly situated to youth offenders who were not sentenced pursuant to the Three Strikes law and that there was no rational basis for the different treatment. (*Id.* at pp. 1164–1165.)

We disagreed, citing several appellate decisions that "have rejected equal protection challenges to the differential treatment of three strikes offenders, concluding that such offenders are not similarly situated to nonrecidivist offenders and/or that a rational basis exists to treat them differently." (*Wilkes*, *supra*, 46 Cal.App.5th at pp. 1165–1166.) For example, in *People v. Cooper* (1996) 43 Cal.App.4th 815, 829, the court explained, "A person who has committed and been convicted of two serious or violent felonies before the instant offense is a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system. . . . It is reasonable for the Legislature to distinguish between those felons . . . who come to court with a history of serious or violent felony convictions and those who do not." (See also *People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1332; *People v. Spears*

17

(1995) 40 Cal.App.4th 1683, 1687; *People v. McCain* (1995) 36 Cal.App.4th 817, 820.)

The *Wilkes* decision explained, "The purpose of section 3051 is 'to give youthful offenders "a meaningful opportunity to obtain release" after they have served at least 15, 20, or 25 years in prison (§ 3051, subd. (e)) and made " 'a showing of rehabilitation and maturity' " and 'to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s.' [Citation.] Assuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former—'a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system' [citation]—presents too great a risk of recidivism to allow the possibility of early parole." (*Wilkes*, *supra*, 46 Cal.App.5th at p. 1166; accord *People v. Moore* (2021) 68 Cal.App.5th 856, 863–864.)[7]

---

[7] The California Supreme Court will consider a different but related equal protection claim in *People v. Williams* (2020) 47 Cal.App.5th 475, review granted July 22, 2020, S262229. In *Williams*, the court of appeal, applying a rational basis test, rejected a *one-strike* defendant's equal protection challenge to section 3051, subd. (h). (*Williams*, at p. 493.) The court held "the threat of recidivism by violent sexual offenders—as demonstrated by the Legislature's enactment of several comprehensive statutory schemes to curb such recidivism among such offenders—provides a rational basis for the Legislature's decision to exclude one strikers from the reach of section 3051." (*Williams*, at p. 493; but see *People v. Edwards* (2019) 34 Cal.App.5th 183, 197 [holding carve-out for one-strike offenders unconstitutional]; *In re Woods*, *supra*, 62 Cal.App.5th pp. 753–760 [same].)

18

We follow the *Wilkes* decision in holding the differential treatment of youth offenders sentenced pursuant to the Three Strikes law for purposes of youth offender parole hearings does not violate equal protection.

DISPOSITION

The trial court's judgment is affirmed.

SIMONS, J.

We concur.

JACKSON, P. J.

NEEDHAM, J.

(A164265)

19